T.C. Memo. 2005-287


UNITED STATES TAX COURT


JOSEPH A. AND SARI F. DEIHL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11136-02, 16293-02,     Filed December 15, 2005.
            1024-03.


        During 1996, 1997, and 1998, Ps operated a
multilevel marketing enterprise through two related S
corporations, M and K.

        <u>Held</u>:  Ps are entitled to deductions claimed
through and in connection with expenditures of M and K
as redetermined herein for 1996, 1997, and 1998.

        <u>Held</u>, <u>further</u>, Ps are not entitled to include in
cost of goods sold for M an amount claimed for
purchases in 1998.

        <u>Held</u>, <u>further</u>, Ps are not entitled to a reduction
in adjusted gross income of $550,000 for 1996.

        <u>Held</u>, <u>further</u>, Ps are liable for accuracy-related
penalties pursuant to sec. 6662, I.R.C., for 1996,
1997, and 1998.

Donald W. MacPherson and Bradley Scott MacPherson, for petitioners.

Jonae A. Harrison and J. Robert Cuatto, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  In these consolidated cases, respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes:

| Year | Deficiency | Penalty Sec. 6662, I.R.C. |
|------|-----------|---------------------------|
| 1996 | $1,364,714 | $272,942.80 |
| 1997 | 2,348,943 | 608,473.00 |
| 1998 | 1,108,775 | 221,755.00 |

After concessions by the parties, the principal issues for decision are:

(1) Whether petitioners are entitled to deductions claimed through and in connection with expenditures of two related S corporations, Mayor Pharmaceutical Laboratories, Inc. (Mayor), and KareMor International, Inc. (KareMor), for the taxable years 1996, 1997, and 1998;

(2) whether petitioners are entitled to include in the cost of goods sold for Mayor an amount claimed for purchases in 1998;

(3) whether petitioners are entitled to a reduction in adjusted gross income of $550,000 for the taxable year 1996; and

(4) whether petitioners are liable for the section 6662 accuracy-related penalty for 1996, 1997, and 1998.[1] Certain additional adjustments, e.g., to itemized deductions, are computational in nature and will be resolved by our holdings on the foregoing issues.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. To facilitate disposition of the above issues, we shall first set forth general findings of fact and then, where appropriate, make additional findings in conjunction with our analysis of and opinion on discrete issues.

Petitioners Joseph A. and Sari F. Deihl (individually referred to as Mr. Deihl and Mrs. Deihl, respectively) are husband and wife. During the years in issue and at the time the petitions were filed in these cases, petitioners resided at 4627 East Foothill Drive, Paradise Valley, Arizona 85253. Petitioners have two children, Joseph Deihl II (Joe II) and William Deihl (Bill). During the years in issue, Joe II was married to Kim, and Bill was married to Denyse. Petitioners also have several grandchildren.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Mr. Deihl completed his formal education upon graduation from the eighth grade and has since been engaged in a series of entrepreneurial business ventures. Mrs. Deihl, who has an eleventh grade education, was an integral participant with her husband in these ventures. In the early 1980s, petitioners began to investigate the possibility of developing and marketing a vitamin complex administered in spray form. Petitioners in the mid-1980s acquired a patent for the formula for such a spray multivitamin and incorporated Mayor to manufacture the product.[2] Petitioners jointly own 100 percent of the stock in, are officers of, and control Mayor.

Petitioners experimented with several different methodologies for marketing their product, which came to be known as VitaMist. An initial attempt at placement in convenience stores was unsuccessful. Petitioners later sold the product through a third-party network marketing company, "Eureka Foods", but that company subsequently went bankrupt. Then, for a period of several years, petitioners marketed the product through Home Shopping Network. Eventually, in 1992, petitioners incorporated KareMor to market the VitaMist products.[3] As with Mayor, petitioners jointly own 100 percent of the stock in, are officers of, and control KareMor.

---

[2] Mayor elected S corporation status in 1991.

[3] KareMor elected S corporation status in 1993.

KareMor was structured as a multilevel network marketing company with hierarchical levels of distributors. In ascending order from entry to the highest echelon, the levels included: Consultant, Silver, Gold, Opal, Sapphire, Ruby, Emerald, Diamond, and Crown. Distributors were independent representatives who purchased from KareMor and then resold the VitaMist products. Distributors also had the opportunity to recruit additional distributors, resulting in a pyramid structure of what were referred to as "downline" distributors. Advancement in the KareMor organization depended upon the volume of product purchases generated by the distributor and his or her downline associates, as well as upon the width and depth of this downline network.

The compensation earned by a distributor from participation in the KareMor network similarly depended upon the volume of product purchases generated by both the distributor and his or her downline network. For instance, higher volume distributors received larger discounts on VitaMist product purchases, providing potentially greater profit margins on resales down through their chains of downline associates and/or to ultimate consumers. The compensation credited to a distributor could thus generally be characterized as equivalent to a system of commissions, bonuses, or "overrides".

In keeping with KareMor's nature as a multilevel marketing organization, a primary focus of the entity's operations was on motivating its distributors.  To that end, KareMor sponsored large-scale conventions and also conducted smaller training and meeting events at locations throughout the country.  Extensive use was likewise made of prizes and awards as motivational incentives, many of which were given away at the conventions. For instance, during the years in issue, a convention was held each calendar quarter and typically lasted 3 days.  The schedule would include substantive sessions devoted to training and informational or motivational speakers, as well as entertainment portions featuring musical performers, dancers, celebrities, prizes, etc.  Featured prizes might be cash, Rolex watches, cruises, and so on.

Petitioners and members of their extended family played a prominent role in interacting personally with distributors at KareMor events.  In these interactions, petitioners believed that it was critical for every aspect of their lives, from their attire and personal grooming to their residence, to portray an appearance of extreme affluence and success.  Petitioners felt that distributors who were impressed to the point of being overwhelmed with what could be achieved through multilevel marketing would be encouraged to build their own downline networks in hopes of reaping similar benefits.

In execution of this strategy, petitioners hosted at their residence a number of events to which distributors were invited. Petitioners frequently used their home for training sessions, meetings, and entertainment functions, including an annual Halloween party attended by as many as several hundred people and an annual "come home" event used to showcase both the corporate properties in Phoenix and petitioners' residence. To accommodate such usage and their image-related goals, petitioners during the period from late 1996 to early 1997 engaged in an extensive renovation of their personal residence. They sought to create a "showplace" or "trophy" home. Components of the remodel included an enhanced driveway and fountain area, a columned porte cochere, a large vestibule, redesigned bedroom and den/office area, raised hallway ceilings, limestone flooring, new windows and French doors, a lighting system, gold-leaf trim, furniture, and interior design elements. The residential property also included a swimming pool, tennis court, fountain, and extensive landscaping.

Both Mayor and KareMor maintain their principal corporate office in a complex located on 24th Street in Phoenix, Arizona.[4] The complex occupies the east and west sides of the street and includes multiple buildings and surrounding landscaping. On the east side are three buildings: A two-story office building, a

---

[4] The record fails to clarify the precise ownership, as between petitioners and/or one of their various entities, of this property.

manufacturing laboratory, and a storage warehouse. Five buildings are located on the west side and consist of both office and warehouse or industrial space, some of which is leased to third-party tenants.

In operating their businesses, petitioners employed the services of several professional advisers. Robert J. Hartmann, an attorney, certified in Arizona as a tax law specialist in past years and also holding a degree in accounting, met Mr. Deihl in 1983 and became involved in legal work for Mr. Deihl and his companies. Mr. Hartmann initially assisted with contract disputes and organizational issues, and by 1998 approximately 70 percent of his practice was devoted to providing services for petitioners and their entities. At that time and at Mr. Deihl's request, Mr. Hartmann relocated to an office on 24th Street to be closer to the corporate headquarters.

With respect to the accounting function, prior to about the 1991 to 1992 period, petitioners had employed the services of an outside accounting firm, referred to as "Duskin & Duskin", apparently working principally with Bernie Duskin, alleged to be a certified public accountant (C.P.A.). Mr. Duskin introduced Mr. Deihl to Martin D. Goltz, recently arrived in Arizona from Illinois. Mr. Goltz had received from DePaul University in Chicago, Illinois, a degree in accounting in 1964 and then a juris doctorate in 1967. Mr. Goltz was licensed by the State of

Illinois as a C.P.A. in about 1966 and maintained that license for approximately 20 years. He thereafter ceased to renew the license because he had not fulfilled continuing education requirements. Mr. Goltz similarly obtained a license to practice law from the State of Illinois in 1967 or 1968, and he maintained the license until he was disbarred in 1985 or 1986.

After being introduced to Mr. Deihl, Mr. Goltz was engaged by Mayor as an independent contractor to perform part-time accounting and consulting work. During 1994 or 1995, Mr. Goltz was hired as a full-time employee and provided with an office at the corporate headquarters where he displayed the various professional degrees and certificates pertaining to his career as a C.P.A. and attorney in Illinois. By 1996, the first of the years in issue, Mr. Goltz served as the accountant and CFO for both Mayor and KareMor. Mr. Goltz prepared the original income tax returns for petitioners, Mayor, and KareMor for 1996 and 1997.

As the businesses grew throughout the years in issue, Mr. Goltz became overwhelmed with the volume of work. An individual hired to assist him proved to be a poor fit for the companies and failed to relieve the burden. The business and tax records were not computerized and were manually prepared. Mr. Goltz estimated substantially all of the expense items, including the inventory for both companies. As he testified:

"And it certainly wasn't intentional but it was literally throwing numbers together to try to get the returns, you know, filed on time."

At some point during 1998, and apparently in conjunction with an investigation into whether to take one of his entities public, Mr. Deihl engaged the C.P.A. firm Donald R. Leo and Company, Ltd., to review financial materials and tax returns. As problems came to light, Mr. Goltz was demoted from his position as CFO; an individual named Pam Roeper was hired to succeed him in that role; and Mr. Leo was engaged to reconstruct financial records, to create general ledgers, and to prepare tax returns based thereon. Mr. Goltz stayed with the companies until late 2000 attempting to provide whatever assistance he could to Mr. Leo. Between June of 1998 and April of 2000, Mr. Leo prepared and filed on behalf of petitioners, Mayor, and KareMor amended returns for 1996 and 1997, and original and (for petitioners only) amended returns for 1998.

OPINION

I.  Preliminary Matters

     A.  Record Generally

As indicated by the recitation of issues at the outset of this opinion, these cases principally concern petitioners' entitlement, through their S corporations, to deductions or offsets for a wide range of expenditures. The notices of

deficiency involved nearly a hundred adjustments, and the parties are to be commended for substantially narrowing the categories that remain at issue.  Nevertheless, a few preliminary comments about the status of the record are in order.

Despite the above-mentioned narrowing of the issues, the categories that remain in dispute incorporate many dozens of discrete outlays.  The stipulated exhibits alone run well over a thousand pages.  Yet as to a substantial portion of the individual items claimed, petitioners failed to address the specific expenditures at trial or on brief.  Petitioners' testimony instead tended to be broad brushed and conclusory in approach.  There is no shortage of blanket testimony resorting to use of the word "all" in various contexts that the Court is simply unwilling to countenance at face value.  Hence, from a substantiation standpoint, the Court is apparently expected in many instances to rely on nothing more than perhaps credit card statements and the characterizations reflected in the general ledgers offered by petitioners.

In this connection, and as will become clearer in the discussion to follow, the Court observes that petitioners' general ledger categories for expenditures seem to be vaguely defined, overlapping, random, and self-serving.  For example, the rhyme or reason for labeling what would appear to be similar outlays as incurred for training, meetings, and/or conventions,

versus for promotion, versus for meals and entertainment, versus for marketing, is left largely unilluminated. Additionally, testimony regarding their preparation shows that the general ledgers are largely noncontemporaneous attempts at reconstruction of financial records without complete support in underlying primary documentation. Mr. Hartmann stated at trial: "And when Donald Leo was hired he looked at some of the tax returns that had been filed and apparently there was no supporting books and records that go with them. Mr. Leo was hired to create this general ledger for the years '95 '96, '97. I believe he also did 1998." Mr. Goltz's testimony in explaining his role after the hiring of Mr. Leo offers further details, as follows:

    A    Actually what I was doing was most of my time
was spent working with the CPA, that's Mr. Leo and his
staff, bringing the records up to snuff. Everything
was done manually before, okay. There was no computer
system in play and it was just an absolute disaster.
And I would get, I would haul boxes and boxes of
records and help with the inputting. I wasn't doing it
but supplying information so that the records in
essence could be reconstructed because they were a
disaster.

    Q    Did you classify the data that was inputted
or did the person just utilize the face of the check?

    A    The accounting people were classifying it.
And if they had questions I'd do my best to answer them
or get the answer. Or if they needed invoices and they
didn't have them I would do my best to, you know, get
them for them.

    Q    * * * What was the ultimate work product as a
result of CPA Don Leo's efforts with your assistance?

A    There were statements issued for I'm not sure of the time frame.  My guess is '95, 6, 7.  Maybe I'm wrong but I think maybe '98.  And after that I left and I don't really know what took place.  But financial statements were being issued--were issued.

* * * * * * *

Q    Okay.  Was a general ledger prepared as a result of this effort?

A    Yes.

Such testimony hardly instills a resounding confidence in the reliability of these documents.

Furthermore, even as to those items for which the record contains some form of invoice or receipt, those documents in and of themselves and absent any additional explanation from petitioners are often insufficient to establish all requisites for the treatment claimed.  Likewise, for the particular expenditures that petitioners do touch on in the testimony offered, their brief statements typically fall far short of addressing all pertinent requirements for allowance.

Hence, while the Court has dealt with the record presented, we are left with the overall impression that petitioners have chosen to bank on a rather haphazard, big-picture, almost all-or-nothing approach in lieu of the item-by-item documentation or detail we would have expected for issues of this nature.

B.  <u>Burden of Proof</u>

Against the foregoing backdrop, the Court addresses the parties' contentions regarding burden of proof.  As a general

rule, determinations by the Commissioner are presumed correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a).  Section 7491 may operate, however, in specified circumstances to place the burden on the Commissioner.  Section 7491 is applicable to court proceedings that arise in connection with examinations commencing after July 22, 1998, and reads in pertinent part:

SEC. 7491.  BURDEN OF PROOF.

(a) Burden Shifts Where Taxpayer Produces Credible Evidence.--

(1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; * * *

* * * * * * *

(c) Penalties.--Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

See also Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, regarding effective date. Section 7491 is applicable here in that examination of petitioner's 1996, 1997, and 1998 tax years began after July 22, 1998.

With respect to the deficiency determinations in dispute, the operative rules are contained in section 7491(a). Petitioners make the assertion, apparently for the first time on opening brief, that the burden of proof as to factual issues shifts to respondent because "Petitioners have produced credible testimony and documents, most especially regarding their reliance on CPA's [sic] and an attorney." The Court, however, concludes a shift is not appropriate on this record for the reasons set forth below.

First, as can be gleaned from the preceding discussion, the Court finds that petitioners have failed to introduce credible evidence with respect to the majority of the individual expenditures in contention. Credible evidence for purposes of section 7491(a) is defined as "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995. Such quality is lacking in much of what has

been offered here.  Nonetheless, the Court need not probe this matter in detail as to individual items because of the remaining considerations discussed next.

Second, even where credible evidence is introduced, the taxpayer must establish, as a prerequisite to any shift under section 7491(a)(1), that he or she has complied under section 7491(a)(2) with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews. H. Conf. Rept. 105-599, supra at 239-240, 1998-3 C.B. at 993-994. Petitioners in their burden of proof argument make no attempt to address specifically whether they have satisfied these conditions, and the record indicates that they have not.

Since this is primarily a substantiation matter, the ideas of credible evidence and substantiation are to a significant extent intertwined, and our comments above apply equally in this context.  In addition, given the circumstances surrounding the noncontemporaneous reconstruction of records underlying the amounts claimed by petitioners in these cases and the lack of supporting invoices or receipts for a significant number of the outlays, maintenance of all required records would also appear to be lacking.  Full cooperation is likewise called into question where the record contains copies of information document requests from respondent highlighting items requested during the

examination process and never supplied.  Thus, petitioners have not shown compliance with section 7491(a)(2).

Third, this Court has noted in earlier cases the potential impropriety of shifting the burden under section 7491(a) where the taxpayers did not raise the issue prior to the briefing process.  E.g., Menard, Inc. v. Commissioner, T.C. Memo. 2004-207; Estate of Aronson v. Commissioner, T.C. Memo. 2003-189. The rationale for this concern rests upon the possible prejudice to the Commissioner's ability to introduce evidence specifically directed toward cooperation during the audit period.  Menard, Inc. v. Commissioner, supra; Estate of Aronson v. Commissioner, supra.

With respect to the accuracy-related penalty, the Commissioner satisfies the section 7491(c) burden of production by "[coming] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty" but "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions."  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Rather, "it is the taxpayer's responsibility to raise those issues."  Id.  Because, as will be more fully detailed infra, respondent has introduced sufficient evidence to render the section 6662(a) penalty at least facially applicable, the burden rests on petitioners to show why it should not be applied.

C.  Evidentiary Issue

At trial, petitioners sought to introduce into evidence a 20-minute videotape.  Mr. Deihl explained that videos were taken of conventions, training sessions, and other KareMor events.  Clips from the collection of tapes so generated were then used to create the 20-minute summary video offered at trial.  Respondent objected to admission of the video based on rules 401, 901(a), 1001, 1002, and 1006 of the Federal Rules of Evidence, which rules address relevance, authentication, the requirement of original recordings, and use of summaries.  The Court reserved ruling on the tape's admissibility and took the matter under advisement.

Having had an opportunity to review the totality of the record in light of the specific issues presented by these cases, the Court believes respondent's concerns as to relevancy are well taken.  Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Mr. Deihl stated that the video tape depicted "Actions at the conventions, the entertainers, the arrivals, the pomp and circumstances, the pageantry, the gowns worn".  Counsel for petitioners expressed the proffer as follows:

> it is offered as for illustrative purposes as to what
> happened with respect to the training sessions, what's

going on at the house, the hoopla, the hype, the conventions, the costumes, the whole flavor of what this gentlemen has created with KareMor.  And that can be illustrated by photos which we'll move to next, but the photos don't show the excitement in the air like a video does.

Initially, Mr. Deihl testified that only recordings from 1996, 1997, and 1998 were used in creating the videotape. However, after similar assertions with respect to the years depicted in various photographs were shown on voir dire to be unreliable, counsel reproffered the videotape on the more general basis of showing how KareMor operated over "the time frame of '93 through early '99."

On this basis, the Court is not convinced that the videotape would make any fact of consequence to the resolution of these cases more probable.  The record is already replete with generalized evidence attesting to how petitioners ran a successful multilevel marketing enterprise, complete with hype, pageantry, and prizes, as well as a glamorous residence and wardrobe to fit the part.  The Court, as demonstrated in our findings of fact, does not doubt that petitioners' business model successfully used these strategies to instill enthusiasm in the distributors.

Nonetheless, facts of consequence to the outcome of this proceeding are those which would establish that petitioners have met the substantiation and other requisites for the deduction of each of the particular expenditures made in 1996, 1997, and 1998.

The videotape, by its nature, would not even connect any individual outlay reflected in petitioners' ledgers, credit card statements, etc., to any specific business function during the years in issue, since the tape purports to cover only a general modus operandi from 1993 through 1999. Nor would it afford the Court a rational foundation, for example, to estimate the percentage of business versus personal use for a given type of expense, since the tape purports to show only business events. The Court cannot conclude that the video conforms to the definition of relevant evidence in rule 401 of the Federal Rules of Evidence.

Furthermore, even assuming that the videotape could clear the relevancy hurdle, the evidence would properly be excluded under rule 403 of the Federal Rules of Evidence, which reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As indicated in the preceding discussion, the tape would be needlessly cumulative on this record.

Respondent did not object to admission of the photographs offered by petitioners as generally showing petitioners' promotional activities, including conventions, training, and

parties, from 1993 to 1999.  Thus, the Court has a visual representation of petitioners' operations.  There is likewise no shortage of generalized verbal descriptions regarding how petitioners ran their operations, motivated distributors, gave away prizes, created a lifestyle to envy, and so on.  The generalized summary videotape would therefore add nothing material to the evidence before the Court.  The Court shall exclude the videotape on grounds of relevancy or cumulation and need not reach the additional bases for exclusion argued by respondent.

II.  S Corporation Expenditure Deductions

The expenditures of Mayor and KareMor at issue in this proceeding were categorized, first in general ledgers and then correspondingly in relevant tax returns, notices of deficiency, stipulations, and briefs, as pertaining to (1) capitalized business improvements; (2) landscaping; (3) security; (4) training, meetings, and/or conventions; (5) promotion; (6) suspense; (7) marketing; or (8) meals and entertainment.  As alluded to previously and as will be further elucidated infra in text, some of these classifications are ambiguous at best and do not lend themselves to analysis of pertinent issues.  Accordingly, for purposes of discussion herein, the Court will employ the following groupings:  (1) Amortization of residence improvements; (2) landscaping; (3) security; (4) clubs; (5)

entertainment; (6) gifts, awards, or cash; (7) clothing; (8) equipment and furnishings; (9) contributions; and (10) promotion or marketing.

A.  General Rules

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms."  New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Rule 142(a).  As a general rule, section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  An expense is ordinary for purposes of this section if it is normal or customary within a particular trade, business, or industry.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943).  Section 262, in contrast, precludes deduction of "personal, living, or family expenses."

The breadth of section 162(a) is tempered by the requirement that any amount claimed as a business expense must be substantiated, and taxpayers are required to maintain records sufficient therefor.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.  When a taxpayer adequately

establishes that he or she paid or incurred a deductible expense but does not establish the precise amount, we may in some circumstances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). There must, however, be sufficient evidence in the record to provide a basis upon which an estimate may be made and to permit us to conclude that a deductible expense, rather than a nondeductible personal expense, was incurred in at least the amount allowed. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Furthermore, business expenses described in section 274 are subject to rules of substantiation that supersede the doctrine of Cohan v. Commissioner, supra. Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Section 274(d) provides that no deduction shall be allowed for, among other things, traveling expenses, entertainment expenses, gifts, and expenses with respect to listed property (as defined in section 280F(d)(4) and including passenger automobiles, computer equipment, and cellular telephones) "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's

own statement": (1) The amount of the expenditure or use; (2) the time and place of the expenditure or use, or date and description of the gift; (3) the business purpose of the expenditure or use; and (4) in the case of entertainment or gifts, the business relationship to the taxpayer of the recipients or persons entertained. Sec. 274(d).

In addition to the general business expense deduction rule of section 162, section 167 authorizes "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)--(1) of property used in the trade or business, or (2) of property held for the production of income." Sec. 167(a).

When applying sections 162 and 167 in the context of particular items of property, the following general framework has emerged through caselaw. Under either section, the initial question is whether ownership and maintenance of the property is related primarily to business or to personal purposes. Intl. Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970) (and cases cited thereat); see also, e.g., Richardson v. Commissioner, T.C. Memo. 1996-368; Griffith v. Commissioner, T.C. Memo. 1988-445. The answer to this question determines which of three approaches is appropriate: (1) If acquisition and maintenance of the property is primarily associated with profit-motivated purposes and any personal use is distinctly secondary and incidental,

expenses and depreciation are deductible; (2) if acquisition and maintenance is motivated primarily by personal considerations, deductions are disallowed; and (3) if substantial business and personal motives exist, allocation becomes necessary. Intl. Trading Co. v. Commissioner, 275 F.2d 578, 584-587 (7th Cir. 1960), affg. T.C. Memo. 1958-104; Intl. Artists, Ltd. v. Commissioner, supra at 104-105; Richardson v. Commissioner, supra; Griffith v. Commissioner, supra; Kenerly v. Commissioner, T.C. Memo. 1984-117.

Where the property in question is residential in character, a further limitation with potential bearing on business-related deductions claimed under section 162 or 167 is contained in section 280A. Effective for tax years beginning after 1975, that statute reads in part:

SEC. 280A. DISALLOWANCE OF CERTAIN EXPENSES IN CONNECTION WITH BUSINESS USE OF HOME, RENTAL OF VACATIONS HOMES, ETC.

(a) General Rule.--Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an S corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

* * * * * * *

(c) Exceptions for Certain Business or Rental Use; Limitations on Deductions for Such Use.--

(1) Certain business use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling

unit which is exclusively used on a regular basis--

> (A) as the principal place of business for any trade or business of the taxpayer,

> (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or

> (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business.

In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer.

> (2) Certain storage use.-- * * *

> (3) Rental use.-- * * *

B. <u>Amortization of Residence Improvements</u>

The parties stipulated as follows: "KareMor expended monies for lavish improvements to PETITIONERS' personal residence. Based upon those expenditures KareMor claimed amortized expenses. RESPONDENT does not dispute the amounts claimed but disputes the deductibility." Petitioners seek deductions of $313,576 for 1996, $549,028 for 1997, and $566,559 for 1998.

Both petitioners and respondent devote extensive discussion on brief to whether the expenditures by KareMor for improvements satisfy the threshold business purpose criterion pertinent to deductibility under either section 162 or 167. Respondent argues that the amounts were not expended for ordinary and necessary

business purposes, while petitioners contend that creation of a "trophy house" generates an ordinary and necessary business expense akin to an outlay for marketing, promotion, or advertising.  Respondent then goes on to argue that, additionally, the standards for deductibility under section 280A must be met but are not on these facts.  Petitioners, in contrast, maintain that section 280A does not apply.  Their position is:  "Respondent's reliance on §280A is misplaced for the simple reason that that section deals with 'use of a dwelling,' meaning use of a dwelling as a facility, not use of a dwelling as a trophy house aka billboard in lieu of money spent for highway billboard or other media purchases, such as radio, t.v. and newsprint."

Because the Court concludes that section 280A is applicable to petitioners' situation and that petitioners fail to meet the requirements imposed therein, we find it unnecessary to probe further the intricacies of sections 162 and 167.  Even assuming arguendo that the improvements could be considered sufficiently business-related in a multilevel marketing enterprise such as petitioners' to support deductibility under section 162 or 167, section 280A precludes allowance.

The test of section 280A(a) states the following general rule:  "Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an S corporation, no

deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence."  The plain language thus mandates that if a dwelling unit is used as a residence, no deduction is permitted.

For purposes of this rule, "dwelling unit" is defined in section 280A(f)(1)(A) to include "a house * * * and all structures or other property appurtenant to such dwelling unit." The only exception is for such a unit "used exclusively as a hotel, motel, inn, or similar establishment."  Sec. 280A(f)(1)(B).  "Use as residence" is likewise a defined term; to wit, a dwelling unit is used as a residence if it is used "for personal purposes" during the taxable year for a number of days in excess of the greater of 14 days or 10 percent of the days it is rented at fair value.  Sec. 280A(d)(1).  Personal use, in turn, is deemed to have been made of a dwelling unit for a day if it is used for any part of the day for personal purposes by the taxpayer or a family member.  Sec. 280A(d)(2).  In the case of an S corporation, the foregoing rules are applied "by substituting 'any shareholder of the S corporation' for 'the taxpayer'".  Sec. 280A(f)(2).

Given these definitions, petitioners' semantic argument on this issue devolves into mere sophistry.  There is no doubt that the property at 4627 East Foothill Drive is a "house".  The

property was remodeled to become more grandiose, but it still included a living room, dining room, family room, bedrooms, bathrooms, etc. Petitioners slept there, ate there, and had free access to all areas of the home, gardens, and amenities such as the pool. Their grandchildren visited and could go anywhere they pleased. Petitioners entertained guests other than distributors at the property. Accordingly, 4627 East Foothill Drive was a dwelling unit used by petitioners as a residence within the meaning of section 280A.

Because section 280A applies, no deduction is allowed under "this chapter" unless one of the enumerated exceptions is satisfied. "This chapter" refers to chapter 1, Normal Taxes and Surtaxes, of the Internal Revenue Code and includes both sections 162 and 167, which are contained in part VI of subchapter B of chapter 1. Petitioners' apparent suggestion that they can avoid the strictures of section 280A by meeting the requisites of section 162 or 167 and their reliance on cases involving tax years prior to the enactment of section 280A are unfounded.

As this Court has explained:

> Section 280A was added to the Internal Revenue Code by the Tax Reform Act of 1976 to provide "definitive rules relating to deductions for expenses attributable to the business use of homes." S. Rept. 94-1236 (1976), 1976-3 C.B. (Vol. 3) 807, 839. Prior to the enactment of section 280A, this Court had allowed a deduction for an office in an employee's residence on the grounds that the maintenance of such office was "appropriate and helpful" under the circumstances. Congress felt that clear-cut rules

governing deductibility were needed because of the administrative burdens which resulted from requiring taxpayers to substantiate the business element of what is normally a personal item (i.e., maintenance of a residence).  Additionally, there was the concern that, under the standards adopted by some courts (particularly this Court), those which were otherwise personal expenses were being allowed as deductions.  [Baie v. Commissioner, 74 T.C. 105, 108-109 (1980); fn. refs. omitted.]

Cases pertaining to taxable years subsequent to the 1976 effective date of section 280A have enforced the statute in the context of both claimed expenses and depreciation.  For instance, in Griffith v. Commissioner, T.C. Memo. 1988-445, the taxpayer claimed business expenses and depreciation with respect to his residence for tax years both before and after section 280A's enactment.  For 1974 and 1975, the Court applied the standards set forth in Intl. Artists, Ltd. v. Commissioner, 55 T.C. 94 (1970), and advocated by petitioners here, but then noted that section 280A would preclude an allocation between business and personal use for 1976 through 1978 without a showing of exclusive business use of a portion of the home.  Griffith v. Commissioner, supra.  Similarly, addressing tax years 1980 through 1982, the Court in Hefti v. Commissioner, T.C. Memo. 1988-22, affd. without published opinion 894 F.2d 1340 (8th Cir. 1989), discussed the legislative history and observed that "Any personal use of a room or segregated area will preclude its use in computing depreciation or other allocable expenditures".

On a related point, petitioners' contention that the deductions at issue should be allowed notwithstanding section 280A because the house functions as a "trophy house" or "billboard" and could be characterized as marketing, promotion, or advertising is essentially a claim that the applicability of section 280A should turn on the type of business use to which the otherwise residential property is put. This position has been rejected in words that ring true here:

> Section 280A provides a broad general rule requiring disallowance of deductions attributable to the business use of a personal residence, <u>irrespective of the type or form of business use</u>. It is true that the potential for abuse in this area was typified by the situation where a taxpayer would make a dubious claim for a home office deduction. * * * Unfortunately for the petitioners here, the words of the law which Congress passed are straightforward and much broader in their applicability--sufficiently broad as to catch petitioners in their net. We are not, therefore, at liberty to "bend" the law, much as we may sympathize with petitioner's position. [<u>Baie v. Commissioner</u>, <u>supra</u> at 110; emphasis added.]

As regards exceptions under section 280A(c), the record does not show, and indeed petitioners have never claimed, that any are met here.[5] No portion of the residence was used exclusively for business. Hence, neither petitioners nor any of their related entities are entitled to deductions for the capitalized residence improvements.

---

[5] Petitioners state on brief: "Never have Petitioners claimed that (a) their home was a place of business, or (b) that use by distributors was exclusive."

C.  Landscaping

Petitioners seek to deduct under section 162 as business expenses of Mayor and KareMor charges for landscaping and related maintenance.  Portions of the amounts claimed have been allowed or conceded by respondent.  In support of these deductions, the record contains principally a number of handwritten invoices from, and copies of checks made payable to, Audelio Rios, also known as Delio Rios.  Many of the invoices provide few details as to the work performed, and what notations are included frequently appear to be written in Spanish.  At trial, Mr. Deihl and Mr. Hartmann testified that Mr. Rios performed landscaping and maintenance for the corporate property on 24th Street, for petitioners' residence, and for the residence of Joe II, which was located on Mountainview Drive.  Certain of the invoices also contain references to "Biol Dihol" or "3 casas" or "3 houses", and respondent argues that Mr. Rios provided services at Bill's residence as well.

To the extent that the expenditures were incurred for landscaping and maintenance on the residential premises of petitioners and either of their two sons, any deductions are precluded by section 280A for reasons essentially identical to those just discussed in connection with the improvements to petitioners' home.  The definition of "dwelling unit" for purposes of section 280A includes "other property appurtenant to

such dwelling unit". Sec. 280A(f)(1)(A). No portion of petitioners' dwelling was used exclusively for business, and the record is devoid of any showing of business use of the home of either son. Consequently, no deduction for landscaping attributable to these properties is allowable.

With respect to the corporate premises, landscaping and maintenance costs would generally be deductible under section 162. It is further undisputed that Mayor and KareMor incurred such expenses for the 24th Street property. The difficulty arises in that the record provides no link between the business premises and the particular payments reflected in the general ledgers and invoices beyond what has already been allowed or conceded by respondent. Moreover, the evidence is not sufficient to permit any reasonable estimate or allocation under the principles of Cohan v. Commissioner, 39 F.2d at 543-544.

When questioned at trial, Mr. Deihl and Mr. Hartmann attributed 70 percent of the landscaping costs to the corporate property and 30 percent to the residential properties. However, in the December 31, 1998, general ledgers for Mayor and KareMor, a 60-percent business versus 40-percent personal allocation was used for the adjusting journal entries. No attempt has been made to explain the change in position, but the shift does suggest a degree of arbitrariness in the figures.

Mr. Deihl also testified to approximate acreage of 10 for the corporate property, "about 1.8" for his home, and "about an acre, acre plus" for Joe II's residence.  However, no documentary evidence corroborates these numbers, and square footage in any event would seem to be a poor basis for allocation when the scope of landscaping is likely to differ markedly between a showplace home and more prosaic commercial real estate.  Furthermore, to the extent that any references to a particular property can be gleaned from the invoices, these would appear to be weighted toward the residential premises.  The law therefore does not countenance any further deduction for maintenance and landscaping.

D.  <u>Security</u>

The disputed security services were provided by Michael Reed and his subcontractors, by Capital Guard & Patrol, Inc., and by Arizona Protection Agency.  Invoices in the record show that security services were provided by these entities at both the corporate property on 24th Street and at petitioners' personal residence on Foothill Drive.  Protection was also provided to members of the Deihl family when traveling.  Although invoices were occasionally addressed to KareMor, the disputed security services were paid and deducted by Mayor during 1997 and 1998 in the claimed amounts of $192,918.70 and $72,124.64, respectively.

Costs of security at the corporate property are deductible as a business expense under section 162. On audit, after extensive review of documentation, respondent allowed deductions on this basis of $91,372 in 1997 and $24,267 in 1998 that the record reasonably permitted to be identified and allocated to the corporate property. Respondent later stipulated the concession of an additional $1,100 for 1997, the nature of which has not been further explained. Petitioners do not directly allude to any particular charges disallowed that were in fact attributable to the corporate premises and not so characterized by respondent. However, as detailed below in connection with our investigation of petitioners' complaint regarding security on a trip to Puerto Rico, the Court has concluded that an additional deduction for security on the corporate premises is appropriate.

Costs of securing residential property are generally nondeductible under section 280A for the reasons previously discussed in conjunction with petitioners' claims regarding capitalized improvements and landscaping. Mr. Deihl testified that security services were utilized at petitioners' home only during the latter part of 1996 and early 1997, but this testimony is patently contrary to the documentary evidence. Invoices explicitly show charges for security at the house into at least March of 1998, and the record lacks substantiation or explanation for a number of expenditures beyond that date. Mr. Deihl's

assertion that security expenses were 96 to 97 percent business in nature and only 3 to 4 percent personal is likewise in direct conflict with the respective charges shown for the Foothill Drive and 24th Street properties in the proffered invoices. Thus, what testimony was offered concerning the proportion of security costs attributable to the residence has proven unreliable. Nor have petitioners suggested grounds on which any particular expenses disallowed as potentially residential should not be subject to the proscriptions of section 280A.

Regarding costs for security while traveling, Mr. Deihl testified that guards secured merchandise at conventions but also protected family members, particularly children, by acting as a buffer between them and the distributors and by escorting them amongst the various rooms, etc. Petitioners' sole and entire argument on brief addressing security is as follows: "we find that Respondent disallowed almost $12,000 in security expense with respect to security guards during a trip to Puerto Rico in February of 1998 for Petitioners' training. Petitioners testified about the need for security during their business trips."

The referenced outlay is evidenced by an invoice from Michael Reed dated February 18, 1998, showing three charges. The first is $8,646 for 752 hours, at the stated rate of $11.50 per hour, on 2/8/98 through 2/21/98, at the location "POST 1". Next

listed is $3,000 for Tony, Jennifer, and Karlas "ON EP TRIP TO P. RICO", on 2/11 through 2/14, at the rate of $250 per guard per day. Third is $2,829 for 246 hours, at the rate of $11.50 per hour, on 2/8/98 through 2/21/98, at the location "POST 2". Respondent allowed $2,829 of the $14,475 total amount as a deduction and disallowed the remaining $11,646.

Other invoices from Michael Reed contained in the record show locations "HOUSE" and "PLANT", indicating a practice of billing based on these two categories. In examination of the above-described and less definitive invoice, it appears that respondent, absent further explanation from petitioners, may arbitrarily have allowed the lesser charge. Nonetheless, on the basis of an invoice for the previous 2-week period, which as corrected shows an identical 246 hour and 752 hour split for locations "HOUSE" and "PLANT", respectively, the Court is willing to allow petitioners an additional $5,817 in security expenses ($8,646 - $2,829) as attributable to the corporate property.[6]

As to the costs incurred for security while traveling, Mr. Deihl's testimony convinces us that while a portion may represent legitimate business expenses, many are far more

---

[6] The Court notes that with respect to the only other 2-week periods in 1998 for which invoices are in the record, the documents fail to support a similar allocation either because all charges are characterized as attributable to "HOUSE" or because the two locations are listed without specifying the hours or the charges for a particular location.

personal in nature.  Again, however, the record provides no guide for any reasonable estimation under Cohan v. Commissioner, 39 F.2d at 543-544.  Therefore, given the state of the record[7] and petitioners' lack of any explanation or further argument, the Court is not in a position to conclude that respondent's allocations, with the limited exception discussed above, are other than generally reasonable and supported by the available documents.

E.  Clubs

One of the many subsets of expenditures deducted by petitioners under the category referred to as training, meetings, and/or conventions is outlays to Arizona Club, to Gardiner's Resort on Camelback (also referred to as Gardiner's Tennis Ranch), and to Gainey Ranch Golf Club.  Mr. Deihl testified that the Arizona Club is a private social club, charging membership fees, with restaurant, banquet, and catering facilities.  He stated that petitioners used the Arizona Club for events such as business luncheons and training meetings.  They also utilized the catering services for outside parties at their home. Additionally, Mr. Deihl testified that the family made personal use of the club for events including holiday functions and

---

[7] As an additional observation, we point out that at least $1,800 deducted as a security expense is highly suspect in that invoices show the amount was charged to provide band music and three carolers at a Christmas party.

children's parties.  He estimated that 80 to 85 percent of the use was for business purposes and that 15 to 20 percent was for pleasure or personal purposes.

Gardiner's Resort, according to Mr. Deihl, is a private tennis club where petitioners hosted certain smaller KareMor meetings and events.  It was Mr. Deihl's testimony that all use of Gardiner's Resort was business rather than personal in nature. As regards Gainey Ranch Golf Club, petitioners offered no mention of this facility either at trial or on brief.

The record contains a number of invoices from each of these clubs, and the descriptions of the charges thereon typically fall into one of three general categories.  The majority of the descriptions include one or more words indicating food or drink services (or tips in connection therewith), such as "Restaurant", "Dinner", "Lunch", "Food", "Bev", "Wine", "Bar", "Banquet", "Caterout", "Tip", etc.  A smaller number of the descriptions indicate equipment rentals, requested services, or labor in connection with catered events.  The remaining descriptions principally comprise membership dues, finance charges, late fees, or contributions to an employee Christmas fund.

As previously indicated, section 274 imposes limitations on expenses relating to entertainment and associated facilities beyond the general business purpose criterion of section 162. Section 274(a) reads as follows:

SEC. 274.  DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC.,
           EXPENSES.

(a) Entertainment, Amusement, or Recreation.--

    (1) In general.--No deduction otherwise
allowable under this chapter shall be allowed for
any item--

        (A) Activity.--With respect to an
    activity which is of a type generally
    considered to constitute entertainment,
    amusement, or recreation, unless the taxpayer
    establishes that the item was directly
    related to, or, in the case of an item
    directly preceding or following a substantial
    and bona fide business discussion (including
    business meetings at a convention or
    otherwise), that such item was associated
    with, the active conduct of the taxpayer's
    trade or business, or

        (B) Facility.--With respect to a
    facility used in connection with an activity
    referred to in subparagraph (A).

In the case of an item described in subparagraph
(A), the deduction shall in no event exceed the
portion of such item which meets the requirements
of subparagraph (A).

    (2) Special rules.--For purposes of applying
paragraph (1)--

        (A) Dues or fees to any social,
    athletic, or sporting club or organization
    shall be treated as items with respect to
    facilities.

        (B) An activity described in section 212
    shall be treated as a trade or business.

        (C) In the case of a club, paragraph
    (1)(B) shall apply unless the taxpayer
    establishes that the facility was used
    primarily for the furtherance of the
    taxpayer's trade or business and that the

item was directly related to the active
conduct of such trade or business.

(3) Denial of deduction for club dues.--
Notwithstanding the preceding provisions of this
subsection, no deduction shall be allowed under
this chapter for amounts paid or incurred for
membership in any club organized for business,
pleasure, recreation, or other social purpose.

Regulations further define entertainment as "any activity
which is of a type generally considered to constitute
entertainment, amusement, or recreation, such as entertaining at
night clubs, cocktail lounges, theaters, country clubs, golf and
athletic clubs, sporting events, and on hunting, fishing,
vacation and similar trips", sec. 1.274-2(b)(1)(i), Income Tax
Regs., and explain:

An objective test shall be used to determine whether an
activity is of a type generally considered to
constitute entertainment. Thus, if an activity is
generally considered to be entertainment, it will
constitute entertainment for purposes of this section
and section 274(a) regardless of whether the
expenditure can also be described otherwise, and even
though the expenditure relates to the taxpayer alone.
This objective test precludes arguments such as that
"entertainment" means only entertainment of others or
that an expenditure for entertainment should be
characterized as an expenditure for advertising or
public relations. * * * [Sec. 1.274-2(b)(1)(ii), Income
Tax Regs.]

Turning to the situation before us, the Court is satisfied
that the Arizona Club, Gardiner's Resort, and Gainey Ranch Golf
Club are clubs within the meaning of the above-quoted statute and
regulations. Section 274(a)(3) operates as a complete and
outright ban on any deduction for club membership dues. Pursuant

to regulations, this rule applies to "membership in any club organized for business, pleasure, recreation, or other social purpose", which definition includes, but is not limited to, "country clubs, golf and athletic clubs, airline clubs, hotel clubs, and clubs operated to provide meals under circumstances generally considered to be conducive to business discussion." Sec. 1.274-2(a)(2)(iii)(a), Income Tax Regs.  Membership dues and related charges paid to the Arizona Club, Gardiner's Resort, and Gainey Ranch are therefore nondeductible.

With respect to other amounts paid to clubs, legislative history accompanying passage of section 274(a)(3) in 1993, after stressing the blanket disallowance for club dues, states: "Specific business expenses (e.g., meals) incurred at a club are deductible only to the extent they otherwise satisfy the standards for deductibility."  H. Conf. Rept. 103-213, at 583 (1993), 1993-3 C.B. 393, 461.  Here, the record fails to show that the payments made to the Arizona Club, Gardiner's Resort, and Gainey Ranch do so.  Petitioners claimed expenses under the characterization of training, meetings, and/or conventions but have offered insufficient evidence to connect any of the expenditures to a particular business outing or function. Generalized testimony and unsupported estimates regarding business use constrain us to rely on the invoices themselves. These invoices indicate meal and entertainment expenditures

subject to a number of restrictions under section 274, and petitioners have not shown otherwise.  Even leaving aside potentially applicable limitations under section 274(a) and (n), it is enough to note that petitioners have in any event failed to substantiate the expenditures pursuant to the exacting strictures of section 274(d).

F.  Entertainment

With respect to various other specific expenditures claimed either under training, meetings, and/or conventions or under promotion, petitioners offered testimony suggesting a connection to activities or functions of a nature generally thought to pertain to entertainment.[8]  Although petitioners deducted these amounts as expenses for training, meetings, and/or conventions or for promotion, they once again failed to offer any evidence that would link the costs to any particular business function or event or would show that the standards of section 274 should not apply.

---

[8] As noted in our preliminary remarks, with respect to a substantial portion of the items deducted as expenses for training, meetings, and/or conventions or for promotion, petitioners failed to address the specific expenditures at trial or on brief.  It is here in particular that the Court is unwilling to rely on the self-serving characterizations used in the general ledgers or mere credit card charge statements, which standing alone do little to establish even a threshold business purpose.  We are equally unwilling to credit petitioners' blanket assertion that all charges to their "company" card were properly business related.  Such a position simply is not credible on the record presented.

More than $11,000 was reported as paid to Aramark Sports & Entertainment in June of 1998, but no invoices or bills are contained in the record. The sole testimony regarding these amounts was the following statement by Mrs. Deihl: "I believe those are entertainers that we hired because we used to for the conventions and different events that went on we would hire dancers and magicians and all sort of entertainers." Similarly, Mrs. Deihl testified as to payments to Arizona Arts Chorale in March of 1997 deducted by KareMor: "Arizona Arts Chorale I believe is a local chorus or singing group", which was hired to "Entertain distributors" for business events. While the Court has little doubt that petitioners did employ various entertainers in conjunction with business functions, this generalized testimony is insufficient to establish the deductibility of any particular outlay for purposes of either section 162 or section 274.

A like problem exists with respect to payments to Affairs Unlimited in the amount of $6,000 made in September of 1997 and deducted by KareMor and in the amount of $11,372.56 made in November of 1997 and deducted by Mayor. The sole explanation in the record is: "They're a staging company. They set up sets and decor for parties." The Court was not provided with evidence or facts about the nature of any specific "parties" that would support deductibility of these items.

In at least two instances, petitioners apparently attempted to deduct tickets purchased to entertainment events produced by third parties. An expenditure labeled "TICKET SALES" for ASU Gammage in October of 1998 was deducted by KareMor under the training, meetings, and/or conventions category, and Mrs. Deihl testified: "I do know, I do vaguely recall the fact that we took quite a few distributors during one of the meetings or conventions that was here to Gammage for a program. I don't remember what the program is." Petitioners also claimed a $21,220 deduction through KareMor for tickets to one or more Arizona Diamondbacks baseball games. They characterized this expense as one for meals and entertainment but offered no evidence or argument at trial or on brief. Both of these items would seem to be classic section 274 scenarios, but the documentation is patently insufficient to validate any deductions.

G. Gifts, Awards, or Cash

In the course of the multilevel marketing enterprise, petitioners through Mayor and KareMor gave away, principally to distributors, substantial quantities of cash and merchandise. These items were generally intended to serve a motivational purpose, generating incentive and excitement. In some instances, random cash awards presumably served an additional purpose of encouraging distributors to attend business program

presentations.  Concerning the deductibility of such items, the parties focused their discussion and arguments at trial and on brief on the following categories:  Cash, items purchased at Neiman Marcus, items purchased at Landmark Jewelers Ltd. (other than Rolex watches), Rolex watches, items purchased at Saba's Western Wear,[9] and Boss Day Planners.

As relevant here, the proper standard for determining the deductibility of the various items given away by petitioners' corporations depends upon which of two broad characterizations is applicable to each item.  See, e.g., Dobbe v. Commissioner, T.C. Memo. 2000-330, affd. 61 Fed. Appx. 348 (9th Cir. 2003); Jordan v. Commissioner, T.C. Memo. 1991-50; McCue v. Commissioner, T.C. Memo. 1983-580; St. John v. Commissioner, T.C. Memo. 1970-238.

Deductions for business gifts within the meaning of section 274 are flatly disallowed to the extent that the expense for gifts to a particular individual exceeds $25 for the taxable year.  Sec. 274(b)(1); sec. 1.274-3(a), Income Tax Regs.  The term "gift" for purposes of this section is defined as "any item excludable from gross income of the recipient under section 102 which is not excludable from his gross income under any other

---

[9] Due to the abbreviations and other simplification used in many of the documents in the record, the precise name of various of the establishments at which claimed expenditures were incurred is unclear.  The Court therefore has sought merely to enable a reasonable identification of the vendors based on available information in the record.

provision of" chapter 1 of the Internal Revenue Code. Sec. 274(b)(1); sec. 1.274-3(b)(1), Income Tax Regs. A gift in this statutory sense, in turn, "proceeds from a 'detached and disinterested generosity'". Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956)); see also Dobbe v. Commissioner, supra. Such business gifts not in excess of $25 are deductible to the extent that the strict substantiation rules of section 274(d) are satisfied.

In contrast, expenditures for transfers made in recognition of past services or as an incentive for future performance have been permitted as deductions under section 162 on grounds that they involve compensation includable in the gross income of the recipient. See, e.g., Dobbe v. Commissioner, supra; McCue v. Commissioner, supra; St. John v. Commissioner, supra. Prizes and awards to sales personnel have been placed in this category. See, e.g., Dobbe v. Commissioner, supra; Jordan v. Commissioner, supra; McCue v. Commissioner, supra.

Concerning the cash, Mr. Hartmann and Mr. Deihl testified with regard to petitioners' practices in giving away cash at distributor conventions. They refer to a convention event known as "Make Joe pay" time, when Mr. Deihl would hand out "cash prizes" or "awards" ranging from approximately $500 up to $2,500. Mr. Deihl also mentioned gimmicks such as taping $20 bills under chair seats for random recipients.

Based on this testimony, the Court is satisfied that petitioners did use cash as an incentive or award to motivate distributors, and these sums would conceivably be deductible under section 162 as payments for past or future services. Respondent likewise apparently accepted this view and accordingly allowed a deduction for cash that petitioners were able, through documentary evidence, to show was employed in such a manner.[10] Specifically, petitioners provided one convention agenda listing giveaways of $2,100, and respondent permitted a deduction for that amount. For a greater deduction, petitioners rely on the categorical statement that all cash claimed by petitioners as a training, meetings, and/or convention expense or as a promotion expense was "Absolutely" not used for personal purposes. However, without more corroboration, the Court cannot credit such a blanket assertion and is left without a basis for estimate.

Furthermore, regarding diversions such as the random taping of smaller bills under chairs, the underlying motive would appear to be more disinterested than compensatory. Petitioners would have no idea what attendee would select a particular seat, and that individual could be a child or an accompanying friend or family member as to whom any compensatory rationale would be a

---

[10] Respondent also permitted Mayor deduction in 1997 of claimed cash amounts that the record established were used to pay in cash specific service providers employed for business purposes. Petitioners have not alleged comparable facts with respect to any further cash amounts.

far greater stretch.  Hence, these amounts would appear to be business gifts subject to the strictures of section 274 and not substantiated as required therein.

With respect to purchases made at Neiman Marcus, Mr. Deihl testified:  "we purchased items there and gifts for all the advisory boards and for the Crowns at all the conventions and things of that nature.  We also purchased the--some Christmas gifts for the employees from Neiman Marcus every year."  He offered additional details in the following colloquy on direct examination:

Q    For what purpose did you use Neiman Marcus, what kinds of purchases?

A    Well, it would be three separate things.  One would be gifts from their gift gallery to the individuals.

Q    Stop there.  Gift from their gift gallery to be used as gifts or to be used as rewards?

A    To be used as, the purchase could be either one, for rewards or gifts.  I cannot determine what that is from there.  But they also supplied some of the gowns for the ladies in question that would come from Neiman Marcus also.

Q    To your knowledge any personal expenditures? I should say expenditures in Neiman Marcus for personal use?  Without looking at the documents, just a general question, Mr. Deihl, just a general question.

A    Well, most of the time when we did things at Neiman Marcus on behalf of the company we used the company's credit card, an American Express card.  In private uses we'd use our Neiman Marcus charge card which is a separate structure entirely.

The testimony pertaining to Landmark Jewelers was similar in that Mr. Deihl indicated that purchases were made at the jewelry store for both promotional rewards and "actual gifts". He further stated that he did not "recall" making any personal purchase at Landmark Jewelers during the years in issue, although Mrs. Deihl admitted that personal items had been bought at Landmark Jewelers in earlier years. Likewise, Mr. Deihl testified to having purchased at Saba's "little cowboy boot trinkets" to give away to convention participants. However, he also conceded that he made personal clothing purchases at Saba's as well.

Hence, as to each of the foregoing establishments, the record supports that purchases falling into more than one of the various categories that affect deductibility, i.e., compensatory awards, business gifts, and personal items, were made. Some charges are therefore potentially allowable under section 162 alone, others are limited by section 274, and still others are nondeductible under section 262. Yet the record is insufficient for the Court to differentiate and separate the actual charges claimed into the appropriate categories. Petitioners generally chose not to offer item-by-item explanations,[11] and with the

---

[11] In one instance, Mr. Deihl was questioned at trial about a particular invoice item from Landmark Jewelers, namely, a $13,900 sapphire, diamond, and platinum ring. His response was: "Sapphire is one of the achievement levels that we have in the
(continued...)

multiple possibilities that exist, including a category mandating strict substantiation under section 274, the Court is in no position to guess.

As regards Rolex watches, Mr. Deihl testified concerning how these items were given away as prizes at conventions to top-performing distributors.  The Court is satisfied that petitioners did in fact give away Rolexes as compensatory awards potentially deductible under section 162.  The documentary record includes two charges specifically identified as for Rolex watches, made at Landmark Jewelers in May and September of 1997.  However, only as to the September purchase does the record offer any evidence that could tend to corroborate that the particular watch was employed as a prize at a convention in the manner suggested.  Based on the agenda for the KareMor convention held in the Fall of 1997, the Court would be willing to find that a $13,400 business expense for a Rolex watch had been substantiated and would be allowable were it not for the consideration discussed in the following paragraph.  Otherwise no sufficient evidence was presented, and the possibility of personal use was also addressed only by uncorroborated testimony that no Rolex watches were bought for family members.

---

[11](...continued)
organization.  But as I sit here at this point in time I don't remember how this was done or whether it was done for Women of KareMor or something of that nature."  Such testimony only underscores the shortcomings of the record in these cases.

An additional problem was highlighted in the testimony, which problem applies to the Rolex watches as well as to the other alleged incentive awards. To wit, the record leaves substantial uncertainty surrounding the issuance of Forms 1099, Miscellaneous Income, to the distributors. Mr. Deihl on several occasions made statements to the effect that: "everybody in the company received a 1099 that would have included any cash or Rolexes or any other prizes that they won to my knowledge", along with "all their commissions and everything else they've earned."

On this point, the Court observes that petitioners' entities claimed substantial deductions under the category "commissions", separate and apart from the deductions in dispute in these proceedings. No attempt has been made to elucidate us as to how the commission deductions were computed vis-a-vis the amounts assertedly reported on Forms 1099 and the amounts claimed for the various incentive awards under training, meetings, and/or conventions, under promotion, or under suspense. As a result, the record is ambiguous as to how the amounts deducted as commissions were determined and whether there exists any potential for a double deduction if additional amounts were to be allowed for incentive awards. For all of the reasons discussed above, the state of the record renders it inappropriate to permit any further deduction for the motivational giveaways.

The final type of giveaway addressed by the parties was separately discussed on brief and appears to have been given principally for purposes other than motivation. Concerning the Boss Day Planners, Mr. Deihl testified: "As a new distributor came on board he received a day planner which also contained all the policies and procedures of KareMor and the code of ethics that they were to follow and what was dismissible and where we could terminate even the independent distributor for immoral acts or things of that nature." The record contains copies of checks payable to Boss Day Planners, all dated 1999, which total $136,444.35. Petitioners, through KareMor, claimed $113,544.35 of this expenditure as a deduction for marketing in 1998.

On brief, respondent concedes that a valid business purpose supported the outlay to Boss Planners but maintains that the charges were contested in 1998 and not paid until 1999. Referencing the checks just described, respondent states: "each check is dated after April 14, 1999, the date of settlement of the dispute between Petitioners and Boss Day Planners." Petitioners' response to this argument, consisting in its entirety of two sentences, is as follows: "As to the Boss Planners marketing expense, Respondent recognizes (opening brief, p.66) that the payments were made but not until after April 14, 1999. However, 1999 is a closed year and thus, the deduction should be permitted for 1998."

Petitioners apparently do not contest the underlying facts upon which respondent's argument relies but instead offer, without further explanation or support, what would seem to be a novel legal theory. Section 461 provides general rules with respect to the proper year for taking deductions, which in turn rest in part on the taxpayer's method of accounting under section 446. An accrual method taxpayer, such as KareMor and Mayor in these cases, is typically entitled to a deduction "in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Secs. 1.446-1(c)(1)(ii)(A), 1.461-1(a)(2)(i), Income Tax Regs.; see sec. 461(h)(1), (4).

The first prong of the above test requires the existence of the liability to be fixed and noncontingent. Vastola v. Commissioner, 84 T.C. 969, 977 (1985). The second prong addresses amount, and the interaction of these two requirements is illustrated by regulation:

> While no liability shall be taken into account before economic performance and all of the events that fix the liability have occurred, the fact that the exact amount of the liability cannot be determined does not prevent a taxpayer from taking into account that portion of the amount of the liability which can be computed with reasonable accuracy within the taxable year. For example, A renders services to B during the taxable year for which A charges $10,000. B admits a liability to A for $6,000 but contests the remainder. B may take

into account only $6,000 as an expense for the taxable year in which the services were rendered.  [Sec. 1.461-1(a)(2)(ii), Income Tax Regs.]

Thirdly, economic performance generally occurs in connection with the provision of services or property as the services or property is provided.  Sec. 461(h)(2)(A); sec. 1.461-4(d)(2)(i), Income Tax Regs.  An exception to this rule, under which economic performance is deemed to occur only when payment is made, applies in specified circumstances where the liability to make payments arises, inter alia, out of a breach of contract.  Sec. 1.461-4(g)(2), Income Tax Regs.

Here, the record lacks any specific information with regard to the nature of the underlying dispute and settlement with Boss Day Planners.  Consequently, the Court is unable to ascertain whether any, much less all, of the three requirements for accrual have been satisfied.  We are faced with a situation where petitioners do not dispute that they contested at least a portion of the charges attendant to the Boss Day Planners transaction in 1998, they have not established any particular amount as to which they had agreed by the end of the taxable year, and they made no payments during the taxable year.  The Court cannot countenance a deduction in these circumstances.

H.  Clothing

Among the expenditures claimed by petitioners under the categories of training, meetings, and/or conventions or of promotion were a number of charges incurred at establishments such a Capriccio's Apparel, Battaglia Shop, Saba's Western Wear, Bardelli Apparel, Cuzzens Forum, Danese Creations, Andrelani, and Neiman Marcus.  The sole documentary evidence for the majority of these expenditures consists of credit card statements showing, if anything, a one- or two-word explanation such as "APPAREL/ACCESSORIES".  Only for purchases at Neiman Marcus do we have any appreciable number of invoices.

Petitioners did not testify specifically as to any of these charges but did offer generalized statements about their purchases at these establishments.  Mr. Deihl stated that Capriccio's Apparel was a women's fashion store, where Mrs. Deihl and other women of the family would purchase gowns to be worn on a one-time basis.  He likewise explained that Battaglia Shop was a highend men's and women's clothing store where purchases "for business purposes" were made.  His testimony about Saba's, previously alluded to, admitted that both business and personal purchases were made at the western wear shop.

Petitioners' position on and rationale for the deductibility of such items was expounded in the following testimony:

Q    And describe for the Court your method of operation with respect to wardrobe or costume for those in your company participating at the conventions?

A    Well, if you're going to give the appearance of affluence you have to be capable of looking the part.  And obviously wearing a different suit between the morning session and the evening session has bearing on it.  More so with the women.

As I said earlier, we worked the tables, both my sons and their wives and my wife.  We would visit all 5,000 people.  We would talk to all five, shake hands with them, turn around and they would have met all three of the families during that last night at that last time.  So it would be imperative that the gowns worn by the girls especially could not be the same ones that they had on at an earlier function because they were always a constant reference at the tables by the distributors saying "What a beautiful gown."  "Isn't that gorgeous."

It was obviously over the top type dress.  I mean you couldn't wear it to the grocery store or the gym or anything but it was done on purpose so that all the children and everybody else had matching outfits on and it just generated the enthusiasm backwards from them that they wanted to be and participate.

Q    * * * The wardrobe we're talking about that was paid for by the companies?

A    Yes.

Q    And what was the policy as to whether the women could wear the dress more than once?

A    No.  The dress, once the dress had been seen it could not be seen again.

Q    And then what happened to the dress?

A    They all went to charity or were just given away to third parties.

Q    And what rule, if any, with respect to the men?

A    The men was a little bit easier because most of the time they would just have to have tuxedos.  Our requirement on the men was that they just couldn't--you can't just walk into and buy a tuxedo at Men's Wearhouse and expect somebody to say, "Gee, that's a great looking piece of garment."  It's how it's tailored and how it fits that has more intensity to it.

*    *    *    *    *    *    *

Q    What was the rule with respect to the men as to whether they were to wear the clothing purchased by the company for reasons other than company purposes?

A    There was a six month rule: they had to rotate suits or tuxes, clothing, at least they couldn't wear the same tie and pushout or anything else like that.  And the suit had to be rotated out so that nobody saw them and they could say, "Hey, you were there in that suit yesterday or the day before."  * * *

Q    What was the rule, if any, with respect to whether the men could wear the clothing other than for a company function?

A    It was never stated as such but nobody did it, only because you were always overdressed whenever you went into something.  I mean when you--the exact same tie and shirt and went with the exact same suit so it was a perfect fit and appearance.  Now, you may have six different ties and shirts for that suit.  But, you know, if you walked down the street in it you would almost look like a model walking around.

The test for the deductibility of clothing costs as ordinary and necessary business expenses under section 162 rests on three criteria:  The clothing must be (1) required or essential in the taxpayer's employment, (2) not suitable for general or personal wear, and (3) not so worn.  Hynes v. Commissioner, 74 T.C. 1266, 1290 (1980); Yeomans v. Commissioner, 30 T.C. 757, 767-768 (1958); Bernardo v. Commissioner, T.C. Memo. 2004-199.  In

applying the second prong, some cases have reflected a subjective gloss, while others have taken an objective approach. For instance, as this Court recently explained:

> The subjective test applied by this Court in Yeomans v. Commissioner, 30 T.C. 757, 768 (1958) ["not suited for her private and personal wear"] has been specifically rejected by the Court of Appeals for the Fifth Circuit in favor of an objective test, which denies a business expense deduction for the cost of clothing that is "generally accepted for ordinary street wear" (i.e., for ordinary street wear by people generally rather than by the taxpayer specifically). Pevsner v. Commissioner, 628 F.2d 467, 470 (5th Cir. 1980), revg. T.C. Memo. 1979-311 * * * [Bernardo v. Commissioner, supra.]

We further noted that the objective test "casts a wider net." Id.

Here, petitioners cite Yeomans v. Commissioner, supra, while respondent points to Pevsner v. Commissioner, supra. However, the difference in approaches is immaterial in that petitioners have not established that they met either test. A substantial majority of the outfits revealed in photographs introduced by petitioners of various events and conventions, albeit often formal, are tasteful and would not be out of place in a myriad of business or social settings where participants are expected to "dress up". Although a few of the ensembles do trend toward the "costume" appellation that petitioners urge, petitioners have made no attempt to show any linkage between specific charges and the corresponding articles of clothing. Hence, petitioners clearly fall short of deductibility under an objective approach.

Even under a subjective methodology, the evidence in the record is simply insufficient to permit a deduction. Assuming arguendo that a once-wear policy would render clothing unsuitable for personal wear in petitioners' particular situation, Mr. Deihl's generalized testimony does little to show that each of the claimed charges was in fact for the purchase of such a once-wear item. As respondent notes, among the Neiman Marcus charges is one showing two turtlenecks at $165 each. We are unconvinced that Mr. Deihl's testimony is not overly broad and exaggerated, and we are left with no reasonable basis on which to make any estimate as to legitimately once-wear garments.[12]

I. Equipment and Furnishings

The credit card statements submitted in conjunction with expenditures claimed under training, meetings, and/or conventions and under promotion also reflect purchases at various establishments labeled with descriptions indicating some form of equipment, furnishings, or similar items. For instance, petitioners seek to deduct charges to Circuit City and Best Buy characterized as "ELECTRONICS/APPLIANCES". Petitioners'

---

[12] As a final observation, we note that an additional basis for disallowance rests in the fact that Mr. Deihl indicated that garments were given to charity, thereby raising the possibility of a double deduction absent evidence that these amounts were not already incorporated in the charitable contribution deductions claimed by the various related entities.

testimony with respect to expenses of this genre consists in its entirety of the following from Mrs. Deihl:

> Q    Okay.  I also see some major expenses for Circuit City during that time frame; do you know what these were for?

> A    The only thing I can think of is it would be computers but I'm not really sure.

> Q    Computers for personal use or for--

> A    No. Computers--

> Q    --business?

> A    No, for business use.  It would either be computers or equipment for the company or for the buildings.

Given the admitted ambiguity in this testimony, i.e., Mrs. Deihl conceded that she was "not really sure", petitioners have failed to establish either what was purchased or the business use therefor.  Moreover, computers or peripherals would be subject to the strict substantiation rules of section 274(d) as listed property, absent a showing that the exception set forth in section 280F(d)(4)(B) should apply.

Petitioners also claim an outlay by KareMor on September 5, 1997, to Synthony Music for "MUSICAL EQUIP/ACC/SVC", as to which Mrs. Deihl testified:  "Probably in-house, I would think that was part of the in-house recording equipment that we have."  From this obtuse statement, the Court can draw little and certainly not adequate substantiation of a business expenses under section 162.

As representative of the vast collection of expenditures left unexplained, the Court further notes a similar difficulty with a number of credit card charges that refer to furniture, furnishings, home furnishings, leather furnishings, and related items, as well as to charges at Bed, Bath & Beyond. Or consider outlays for luggage. Without evidence, business relationship is mere speculation, an endeavor not within the purview of this Court.

Nonetheless, as to a charge for exercise equipment, Mr. Deihl testified with specificity that the purchase was for a workout center for employees at the office complex and distinguished the more expensive gymnasium structure purchased for his home. The Court concludes that the $665.74 April 2, 1997, KareMor charge is a deductible business expense.

J. Travel

The disallowed deductions include several charges that the credit card statements indicate were for airline tickets to destinations such as Brazil, Ireland, and Iceland. Mr. Deihl testified generally that attorneys, including Mr. Hartmann, were sent on "Business related" travel. He stated that an individual involved in marketing and promotion, Jim Palasota, was sent to Iceland "To do a training meeting and for the business." Mr. Deihl also affirmed that he went to Ireland "Because we were looking to expand our facilities into Ireland and we were invited

there by the Irish government".  He likewise asserted globally that he had never taken a vacation or an airline trip for personal reasons during the years in issue.  No details of any of the trips were offered.

Leaving aside other potentially applicable limitations, the Court observes that any deduction for travel would at minimum require compliance with the strict substantiation provisions of section 274(d).  Yet Mr. Deihl's testimony in this regard, not to mention the uninformative credit card documents, falls woefully short.  We do not even know the dates of the travel.  No deduction is permitted.

K.  Contributions

Petitioners' records or testimony link several expenditures to the idea of a contribution and/or charitable entity.  For example, concerning an $800 May 6, 1996, Mayor check to New Arizona Family characterized in the general ledger as for "Golf Registration", Mr. Deihl testified:  "The New Arizona Families, it's a charity here in town that we helped co-sponsor and participated in a golf outing with them."  Petitioners sought to deduct the amount under training, meetings, and/or conventions. A $1,000 June 3, 1997, KareMor charge to Phoenix Zoo was labeled on credit card statements as "ADMISSION/TICKETS", but Mrs. Deihl testified:  "I would assume it was a donation to the Phoenix Zoo."  The amount was claimed under promotion.

A KareMor December 31, 1998, ledger entry for $25,840 to the Heart Association, likewise deducted under promotion, was allowed to the extent of $23,440, and the balance of $2,400 was denied. The record contains a receipt from the American Heart Association issued in connection with the 1998 Heart Ball acknowledging cash received of $25,000, less a value of $1,560 for 10 seats at the Heart Ball (including dinner, entertainment, and favors), for a charitable contribution of $23,440. No further testimony was offered.

Petitioners also originally sought deduction of a $5,000 Republican Party contribution for KareMor in 1998 under training, meetings, and/or conventions. A $5,000 amount under this heading was conceded by petitioners in the stipulation of facts without indication of the specific charge or charges involved. Petitioners did not present any argument on brief relating to this expenditure. The only other expense of $5,000 disallowed under this category for KareMor in 1998 was one of the payments to Aramark Sports & Entertainment, and petitioners on brief requested a finding of fact supporting deduction of outlays to this entity.

Although petitioners have never articulated any particular legal theory bearing on the deductibility of the above payments, we make the following general observations. Section 170(a) provides for deduction of charitable contributions made to or for

the use of an organization described in section 170(c) and verified as required by the statute and corresponding regulations. As one example of the requisite verification, contributions of $250 or more are disallowed unless the taxpayer substantiates the donation with a contemporaneous written acknowledgment by the donee. Sec. 170(f)(8).

Here, only with respect to the American Heart Association expenditure did petitioners offer a statement in compliance with section 170(f)(8), and respondent properly allowed a deduction to the extent supported by that document. No basis for any greater deduction has been suggested.

Concerning the other deductions, the record not only reveals problems under section 170(f)(8) but also raises additional issues. Nothing establishes that any were made to qualified donees. The $5,000 payment to the Republican Party was apparently conceded, and political contributions are generally disallowed in any event. Cloud v. Commissioner, 97 T.C. 613, 628-629 (1991). Finally, the Court is not satisfied that the payments to New Arizona Family and the Phoenix Zoo in fact represented contributions and not some form of entertainment expenditure subject to section 274.

L. Promotion or Marketing

There are two other expenditures, one of which actually consists of two separate charges, that petitioners deducted under

the label of either promotion or marketing and as to which they commented specifically at trial or on brief. Petitioners claimed as promotion expenses for KareMor in 1997 payments of $2,000 and $200 made to Gold's Gym on June 11 and 17, respectively. A purchase order and an invoice show that the amounts were paid for equipment rental, gym rental, and labor in connection with a "Birthday lift" by Peter Lupus on June 17, 1997. Peter Lupus was "the strongman off Mission: Impossible" and "a spokesperson for the company". Petitioners also offered a photograph of the June 17 event, about which Mr. Deihl testified:

> A    * * * [The photo] is taken in California at Gold's Gym. It is Peter Lupus in a KareMor sponsored event. He is 65 years of age there. He is lifting a 250,000 pounds in 30 minutes. VitaMist has rented the gym. Guinness Book of World Records is there. A weights and measure officer from the state of California is there to determine the weights and the lifting and the preciseness of everything. Buddy Hackett was there. Landau I think his name is from Mission: Impossible also was there. News events were there and it was promoted and on the news later that evening.
>
> Q    And I notice you have VitaMist on the clothing of--gym clothing I suppose of Mr. Lupus?
>
> A    Mr. Lupus all his clothing had VitaMist made into it and attached to it, especially his workout gear.

The picture shows Mr. Lupus decked in VitaMist garb, and the Court is satisfied that this event represents a promotional endeavor. An additional deduction of $2,200 will be permitted.

In contrast, and demonstrating the sharp distinction in how petitioners supported a few expenses and left the Court to make a leap of faith about the remainder, petitioners deducted under marketing for KareMor $72,500 paid to Lifestyle Advantage in May, June, and July of 1998 for what is characterized in the KareMor ledger as "Sales Aides".  Respondent noted on opening brief the absence of any evidence or testimony regarding these outlays.  In response, petitioners on reply brief offer the following:  "And in reference to Lifestyle Advantage * * * [the general ledger] shows that this 1998 expenditure ($72,500) is for 'sales aids' which should not be surprising, given that Petitioners grossed $19 million in that year."  Such a statement is utterly useless to the Court in addressing any elements whatsoever of deductibility.  No further deduction is warranted for these payments.

III.  Cost of Goods Sold

On page 2 of its 1998 Form 1120S, U.S. Income Tax Return for an S Corporation, Mayor included $747,535 of "Purchases" in computing cost of goods sold.  Respondent disallowed $123,250 of "Purchases" with the explanation:  "The year end accrued payable to Arizona Natural Resources in the amount of $123,250 was never paid, as there was a dispute over this debt.  Thus the $123,250 is not deductible."  During 1998, Arizona Natural Resources, Inc., manufactured for Mayor a line of cosmetics marketed as the

Sari Collection,[13] and various payments were made to the company throughout the taxable year.  However, as shown in a handwritten notation on an invoice from Arizona Natural Resources and in Mayor's general ledger, petitioners paid only a portion of a billed charged and accrued the remaining $123,250 as an additional account payable as of December 31, 1998.

Petitioners mention the purchases adjustment in their pretrial memorandum, stating:  "This is a timing issue.  The dispute was denied and the $123,250 was paid to Arizona Natural resources [sic], plus interest and attorney fees.  Petitioners should not be required to go back and amend returns for a year in which the amount was actually paid."  Petitioners do not discuss the matter on opening brief, while respondent concedes that petitioners did incur valid business expenses with respect to the Sari cosmetic line but argues:  "Because there was a dispute over this amount [the $123,250], it was never paid.  If it were to have been paid, however, deduction would not be permissible until the date of payment."  Petitioners respond on reply brief, with their argument, in its entirety, consisting again of two sentences:  "The monies owed Arizona Natural Resources were paid, but after 1998, and thus, for a period closed for the companies.  Thus, the amount should be deducted for 1998."

---

[13] Petitioners from time to time diversified the products offered through their multilevel marketing structure.

Hence, although the parties' statements pertaining to this adjustment are less than a model of clarity, the circumstances underlying, as well as the parties' arguments with respect to, the payable to Arizona Natural Resources would appear not to be materially distinguishable from those concerning the payments to Boss Day Planners discussed above. Petitioners contested a portion of the charges asserted by Arizona Natural Resources and paid only after resolution of the dispute. In this connection, the Court takes judicial notice of litigation filed in 1999 by Arizona Natural Resources against Mayor, KareMor, and petitioners individually, which culminated in a judgment in favor of Arizona Natural Resources for $333,258.13, inclusive of interest, attorney's fees, and costs, on October 8, 2003. Ariz. Natural Res., Inc. v. Mayor Pharm. Labs., Inc., No. CV1999-070010 (Ariz. Super. Ct., Oct. 8, 2003).

Cost of goods sold operates as a reduction in gross income, rather than as a deduction from gross income. See sec. 1.61-3(a), Income Tax Regs. Nonetheless, the test for determining whether an accrual method taxpayer is entitled to include an amount in cost of goods sold is the same as that for determining the appropriateness of a deduction. Id.; sec. 1.446-1(c)(1)(ii), Income Tax Regs. In other words, an amount may be included in cost of goods sold "in the taxable year in which all the events have occurred that establish the fact of the liability, the

amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Sec. 1.446-1(c)(1)(ii), Income Tax Regs.

Here, as was the case with the outlay to Boss Day Planners, the record suggests that some, if not all, of the requisites for inclusion of the $123,250 in cost of goods sold have not been met. Respondent is sustained on this issue.

IV. Reduction in Adjusted Gross Income

The parties' positions with regard to the propriety of a reduction in petitioners' 1996 gross income center on the concept of duplication. Petitioners contend that unless their gross income for 1996 is reduced by $550,000, they will be taxed twice on this amount. They allege that such a reduction was made with respect to 1997 and that a like treatment should be accorded for 1996. Respondent contends that an adjustment was made to 1997 to eliminate duplicate reporting for that year which does not exist for the 1996 year.

Again, the underlying documentary record on this issue leaves much to be desired. Mr. Goltz prepared petitioners' original Forms 1040, U.S. Individual Income Tax Return, for 1996 and 1997. Subsequently, Mr. Leo prepared Forms 1040X, Amended U.S. Individual Income Tax Return, for each of those years. On the 1996 Form 1040X, petitioners reported an increase in adjusted gross income of $550,000, derived from an additional $550,000 of nonpassive income from partnerships and S corporations. On the

1997 Form 1040X, petitioners reported an increase in adjusted gross income of $1,700,000, also derived from an additional $1,700,000 of nonpassive income from partnerships and S corporations.

The adjustments and deficiencies asserted in the statutory notices for 1996 and 1997 were thereafter computed based on the amounts reported in the Forms 1040X. Among the adjustments reflected in the notice of deficiency for 1997 is a decrease in income of $1,700,000 labeled "AGI CHANGE FORM 1040X" and explained: "The $1,700,000 shown on your 1040X return for the estimated increase in income from the related entities is adjusted as shown above." No similar adjustment was reflected in the notice of deficiency for 1996.

Respondent on reply brief addresses the circumstances behind the difference as follows:

> Petitioners' 1997 Forms 1040 and 1040X were prepared by two different Certified Public Accountants. * * * Insofar as Petitioners' 1997 Form 1040X reported an amount previously reported in the Form 1040, namely $1,700,000.00 (now $1,750,000.00), the examiner appropriately adjusted Petitioners' Form 1040X by reducing Petitioners' income by the duplicative amount.
>
> In taxable year 1996, on the other hand, there were no such duplicative amounts between Petitioners' Forms 1040 and 1040X. Consequently, Respondent's examiner made no similar adjustment in Petitioners' 1996 income as in their 1997 income. * * *

Thus, respondent offers an explanation as to why a reduction for the increased adjusted gross income reported on a Form 1040X

would be necessary in calculating a deficiency that is based on the tax reported in the Form 1040X. Such could be the case where the Form 1040X in fact duplicated amounts reported in the original Form 1040. Petitioners, in contrast, seem to argue that a like reduction is more uniformly necessary. Such could be the case only if the deficiency were to be computed based on the tax reported in the original Form 1040, without giving credit for additional tax paid with the Form 1040X. In fact, some of the language used by petitioners could signal a misunderstanding of the basis for the 1996 and 1997 deficiencies, although a cursory review of the notices and relevant returns shows that the baseline numbers in the notices were taken from the Forms 1040X, not the Forms 1040.

So long as the amended returns are used as the starting point, there would generally be no need to eliminate the additional income reported therein from the deficiency calculation. Here, although the manner in which the $1,700,000 was duplicated between the original and amended 1997 returns is not clear from the record, respondent was entitled to determine and concede on audit that it had been. Petitioners have not so much as alluded to, much less demonstrated, any analogous duplication between the original and amended 1996 returns. Accordingly, the Court has no grounds for mandating a concession by respondent of income voluntarily reported by petitioners on their own Form 1040X for 1996.

V.  Accuracy-Related Penalties

Subsection (a) of section 6662 imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to causes specified in subsection (b).  Subsection (b)(1) of section 6662 then provides that among the causes justifying imposition of the penalty is negligence or disregard of rules or regulations.

"Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard."  Caselaw similarly states that "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Pursuant to regulations, "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads:  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is

shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

Regulations interpreting section 6664(c) state:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Reliance upon the advice of a tax professional may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty. Id.; see also United States v. Boyle, 469 U.S. 241, 251 (1985); Freytag v. Commissioner, supra at 888. Such reliance is not an absolute defense, but it is a factor to be considered. Freytag v. Commissioner, supra at 888.

In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional must show, at minimum: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also, e.g., Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting verbatim and with approval the above three-prong test), affg. 121 T.C. 89 (2003);

<u>Westbrook v. Commissioner</u>, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; <u>Cramer v. Commissioner</u>, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); <u>Ma-Tran Corp. v. Commissioner</u>, 70 T.C. 158, 173 (1978); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972); <u>Ellwest Stereo Theatres v. Commissioner</u>, T.C. Memo. 1995-610.

As previously indicated, section 7491(c) places the burden of production on the Commissioner. The notices of deficiency issued to petitioners generally asserted applicability of the section 6662(a) penalty on account of negligence or disregard, substantial understatement, and/or substantial valuation misstatement. See sec. 6662(b). Respondent in its pretrial memorandum and on brief has addressed only negligence or disregard of rules or regulations as the basis for the penalties, and we shall do likewise.

We conclude that respondent has met the section 7491(c) burden of production with respect to the negligence penalties. The evidence adduced in these cases reveals a serious dearth of adequate records and substantiation for reported items. With this threshold showing, the burden shifts to petitioners to establish that they acted with reasonable cause and in good faith as to the claimed items.

Petitioners here assert a reliance defense as the basis upon which they should be relieved of liability for the section 6662(a) penalties. Mr. Deihl, Mrs. Deihl, and Mr. Goltz

testified as to petitioners' total reliance on Mr. Goltz and the other professionals hired with respect to the accounting and tax preparation functions.  Respondent, in seeking to counter this defense, focuses in particular on an alleged lack of competence on the part of Mr. Goltz.  Petitioners in retort devote substantial discussion to why their reliance on a professional who essentially "duped" them was nonetheless reasonable.  The Court, however, is unconvinced that questions of Mr. Goltz's competency are sufficiently central to this issue to warrant the emphasis placed thereon by the parties.

The deficiencies at issue were determined from the positions reported in the amended returns for 1996, 1997, and 1998 prepared on behalf of petitioners by Mr. Leo.  Any reliance was therefore necessarily placed in significant part on Mr. Leo.  No one has addressed Mr. Leo's competency in this proceeding.  Matters of competency, i.e., the first prong of the above-quoted test, thus become more tangential to our analysis.

The second prong, on the other hand, lies at the crux of petitioners' entitlement to the relief sought.  Petitioners must establish that they provided necessary and accurate information with respect to all items reported on their tax returns, such that it can be said that the incorrect returns resulted from error on the part of the adviser(s).  See, e.g., Westbrook v. Commissioner, supra at 881; Ma-Tran Corp. v. Commissioner, supra

at 173; <u>Pessin v. Commissioner</u>, <u>supra</u> at 489.  Petitioners here have not done so.  They have shown neither that they initially gave all requisite information to Mr. Goltz nor that Mr. Leo had available for his use sufficient accurate materials to prepare correct returns.

For instance, did petitioners at one time provide to their advisers receipts or invoices that would substantiate the many expenditures for which the record contains no documentary evidence?  With respect to those items that were reflected in available receipts or invoices, did petitioners offer to their advisers further explanation, particularly in connection with purchases at retail establishments, as to the intended recipient and/or use of the articles purchased?  When they were at conventions, potentially away from their accounting staff, did they maintain documentation of business expenses that arose and carefully segregate any personal purchases?  Were the professionals, like the Court, limited in various circumstances to blanket statements that "all" outlays at a certain location or using a particular credit card related to the businesses?  What specific information was available to the advisers with respect to the improvements to petitioners' residence?  On this record, the Court simply cannot conclude that petitioners have met the evidentiary burden of the second prong of the test for reasonable reliance.

The Court likewise has reservations about petitioners' compliance with the third prong that flow to a certain degree

from the problems raised by the first two criteria.  Mr. Leo was hired to reconstruct records and to prepare corrected returns, so petitioners at that time were well aware of serious deficiencies in Mr. Goltz's performance in these respects.  To have taken a hands-off approach at that juncture, relying on Mr. Goltz to provide any necessary underlying information and explanations, would not seem consistent with ordinary care and prudence.  It further would seem to negate a claim that reliance on the resultant product could be in good faith.  Mr. Goltz would appear even less likely than petitioners in this scenario to recall, for example, verbal descriptions that had at one time elucidated the generic descriptions in receipts, invoices, or credit card statements.  Yet the record contains no suggestion that petitioners assisted in the reconstruction in any meaningful way.

On these facts, petitioners have failed to establish that they met each and every requirement necessary for successful imposition of a reliance defense.  Petitioners remain liable for the section 6662(a) accuracy-related penalties.

The Court has considered all other arguments made by the parties and, to the extent not specifically addressed herein, has concluded that they are without merit or are moot.  To reflect the foregoing and concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>