T.C. Memo. 2007-12

UNITED STATES TAX COURT


YUNG AND ANITA F. CHONG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19581-04.              Filed January 17, 2007.


Yung and Anita F. Chong, pro sese.

<u>Rebecca Duewer-Grenville</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Yung Chong gave money to his brother to help open a business in Beijing.  He had another business in this country, and he and his wife, Anita, claimed large deductions on their 1998 tax return for losses from both.  The Commissioner disallowed almost all of them due to a near complete lack of records.  The Chongs blame this in part on a catastrophe suffered

when a labor dispute at the Chong brothers' store in Beijing turned ugly--the store was ransacked and looted, and his brother had to skedaddle out of China.

FINDINGS OF FACT

Yung Chong works full time as a driver for Federal Express, but he has a strong entrepreneurial spirit that impels him to seek out business opportunities. His brother, Lok Chong, shares his spirit, and they began to collaborate in 1993 when Lok found a market in China for leftover chicken parts and Yung found a way to buy those chicken parts from large chicken producers in the United States. The Chong brothers did quite well for several years until those they called the "big boys" began selling directly to China. The Chongs' chicken parts business dried up and a few years passed while Lok and Yung looked for a new opportunity.

Lok, who is an Australian citizen, moved to Beijing in 1997 and spotted an opportunity to import Western food for the growing expatriate population there. Lok took the leftover money from the chicken venture, Yung supplied some additional capital,[1] and Gourmet Down Under was born. Gourmet Down Under specialized in importing and distributing Australian dairy products, but also sold American beef and even some authentic Mexican food. Lok

---

[1] Available records do not show how much Yung Chong contributed to the venture over the years, but the parties agreed that he had contributed at least $88,500 by the end of 1998.

opened his shop next to the U.S. embassy, and at first the store did well. But then, in 1999, Lok discovered that several of his employees were importing yogurt from France in direct competition with Gourmet Down Under. Even worse, they were using company facilities, storage, delivery trucks, and business contacts to do so. Lok fired five employees. Unfortunately, he fired them during Chinese New Year--which, as he credibly testified, is a big taboo in Chinese culture.

Retribution was swift: the storefront was torched, the office was ransacked, and the bank account was drained. Everything was destroyed, including the business records. Lok filed a police report with the Beijing Public Security Bureau, but made no effort to reconstruct the store's daily business records from prior years. The only documentation from the 1998 tax year was a general profit and loss statement and a balance sheet, both of which Lok sent to Yung in early 1999. There were no records to support the revenue and expenses that Yung and his wife reported on their 1998 return, or to prove Yung's percentage ownership of the business during the year. The only thing that can be determined about Yung's interest, and even that by testimony alone, is that he owned one-third of the business by the end of 1998.

Back in the United States, Yung was working at his regular full-time job as well as industriously developing ways to make money on the side. The main focus of his efforts was NuSkin, a multilevel marketing company. Yung acted as an independent contractor for NuSkin, incurring various business expenses such as gas, car maintenance and insurance, tolls, and business meals. By his own testimony, Yung was very frugal in his day-to-day expenses: he scheduled his business meetings to avoid paying multiple tolls; he bought "a few" used cars rather than a new car and got special deals from a mechanic when he needed those cars repaired; and he treated his prospective clients to meals at only inexpensive restaurants. Yung kept receipts for many of his expenses but, as with Gourmet Down Under, he did not have the sort of systematic records of income and expenses customarily kept by businessmen.

In April 1999, Yung filed a joint tax return with his wife, Anita. They did not use a professional preparer, and claimed more than $40,000 in partnership losses and thousands more in self-employment expenses. The effect on their tax bill was dramatic--if allowed, the losses would completely eliminate their combined taxable income. The Commissioner sent the Chongs a notice of deficiency, denying each of the claimed deductions, stating "it has not been established that the expenses were incurred and paid during the taxable year." The Commissioner

also added a 20-percent penalty under section 6662(a)[2] for negligence or disregard of the rules and regulations or, alternatively, for substantially understating the amount of income tax due.

The Chongs were California residents when they petitioned this Court, and there was a short trial in San Francisco.

OPINION

I. Partnership Loss

In early 1999, Lok Chong sent his brother a profit-and-loss statement for Gourmet Down Under. Lok didn't send a Schedule K-1, nor did he provide any records to verify the business purpose of the many expenses shown on the statement. This statement showed a total partnership loss of over $120,000 for the year, about $40,000 of which was attributed to Yung. Yung claimed his loss on his Schedule C as an "other expense," but has since conceded that it should have been reported as a partnership loss on Schedule E.

There are four questions which must be answered before we can determine whether Yung was entitled to a partnership loss: (1) did a partnership exist; (2) if there was a partnership, what was Yung's distributive share; (3) what was the partnership's

---

[2] All section references are to the Internal Revenue Code in effect for 1998. Rule references are to the Tax Court Rules of Practice and Procedure.

total loss; and (4) how much of that loss, if any, can Yung claim.

A.    Did the partnership exist?

Section 761(a) defines a partnership to include "unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate."

The Commissioner concedes that the Chong brothers had a partnership that began in 1993 when they started importing chicken parts into China from the United States.  We find that the brothers continued to seek out new ventures for their China enterprise even after the chicken parts business ended--and because a partnership continues until "no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners," sec. 708(a) and (b)(1)(A), Lok and Yung continued to be partners at least until 1999 when Lok escaped the destruction of Gourmet Down Under.  Exactly how long the partnership continued after Gourmet Down Under cratered doesn't matter.  The only relevant issue is whether the partnership was valid and continuing at the end of the 1998 tax year.  We find that it was.

B.    What was Yung's distributive share?

A distributive share is the portion of a partnership's income and losses which flows through to an individual partner. Normally, each partner's distributive share is set out in a partnership agreement.  Sec. 704(a).  When a partnership agreement is silent, each partner's distributive share is determined by his interest in the partnership.  Sec. 704(b)(1). A partner's interest is determined by looking at "all facts and circumstances relating to the economic arrangement of the partners."  Sec. 1.704-1(b)(3)(i), Income Tax Regs.  There is a presumption that each partner has a *per capita* share in the partnership, but this may be rebutted by facts and circumstances showing a different arrangement.  Id.

Based on the testimony of both Lok and Yung, and the profit and loss statement for 1998, we find that Yung had a one-third interest in the partnership at the end of 1998.  However, it is somewhat unclear whether he held a one-third interest for the entire tax year, or just at the end.  Yung testified that he contributed $10,000 during 1998, but then in the answering brief accepted respondent's statement that he didn't make any capital contributions after 1995.  A partner's distributive share must take into account the various partnership interests throughout the year as well as the length of time each interest was held, sec. 706(d), but we do not find Yung's assertion that he made an

additional contribution (unsupported by any check or money order receipt) in 1998 to be credible. We therefore find that he had a one-third interest in the partnership throughout the year.

C. What were the partnership's total losses?

Just like individuals, partnerships must keep records to support claims of income, deductions, credits, etc. See sec. 1.6001-1(a), Income Tax Regs. Such records must show a sufficient business connection for any deductions. Gorman v. Commissioner, T.C. Memo. 1986-344. When it is evident that there were business-related expenses but the taxpayer is unable to produce records, we do have the authority to estimate, Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), but have to have something on which to base our estimate. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Section 274(d) further limits our discretion by adding requirements for substantiating certain kinds of expenses--a burden we can't lift by relying on the Cohan rule. Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969).

This is a real problem for the Chongs, because Yung himself had no first-hand knowledge of the partnership's income and expenses. And Lok's bookkeeping was very informal--he admitted that he fed his family by withdrawing inventory from the store, and he failed to produce a single receipt, deposit slip, or check

book in support of the summary profit-and-loss statement.  Even by the end of the trial, the only record that either brother produced to prove any item of the partnership's income and expenses for the 1998 tax year remained that same profit-and-loss statement.  Lok claims, and we believe, that he paid Chinese taxes on the partnership income, but Yung didn't submit any Chinese tax returns--or any other records for that matter--into evidence.

We do find that the primary reason there is so little in the way of documentation is that all the records were destroyed in 1999.  The Chong brothers--particularly Lok, since he was the onsite manager of Gourmet Down Under--should have tried to salvage or reconstruct what records he could.  See, e.g., Cox v. Commissioner, T.C. Memo. 1980-244.  This sort of "reasonable reconstruction" is always a good practice, and it is required for expenses (like the travel expenses that the partnership claimed) subject to section 274's limitations.  Sec. 1.274-5T(c)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985); see Seckel v. Commissioner, T.C. Memo. 1974-170.  We have not seen any evidence of any such reconstruction by either Yung or Lok; we therefore are unable to apply such a defense to this case.  The lack of records--compounded by the absence of any testimony by Lok about any specific items of income or loss--

leads us to find that the partnership has not proven its actual losses for the 1998 tax year.

   D.   How much of a loss, if any, can Yung claim?

Even if we could determine the partnership's total losses, Yung would still only be able to claim his share of such losses to the extent of his adjusted basis.  Sec. 704(d); Sennett v. Commissioner, 80 T.C. 825 (1983), affd. 752 F.2d 428 (9th Cir. 1985).  Adjusted basis is essentially the partner's contribution to the partnership increased by his distributive share of partnership income and decreased by cash distributions and his share of partnership losses.  Sec. 705(a).  A partner's distributive share of income or losses automatically flows through to him.  See sec. 702(a); sec. 1.702-1(a), Income Tax Regs.  But his adjusted basis can't go below zero; if his distributive share of partnership losses is greater than his available adjusted basis, the excess loss can't be claimed in that year but must instead be carried forward until he once again has adjusted basis available to offset the loss.  See sec. 1.704-1(d)(1), Income Tax Regs.

To determine Yung's adjusted basis in the Chong brothers' partnership at the end of 1998, we must know how much he contributed to the partnership and his annual distributive share of partnership income and/or losses since the partnership began. Both Yung and Lok credibly testified that there had never been a

cash distribution made to Yung, so we needn't concern ourselves with that portion of the adjusted basis equation.  And the Commissioner has conceded that Yung contributed at least $88,500 to the partnership since 1993.  However, even if we take that as a starting point to determine his adjusted basis, we have no record of Yung's distributive share of income or losses in the partnership during the previous five years.  A line item on the 1998 balance sheet shows "losses carried forward," which implies Yung was unable to claim prior losses due to a zero adjusted basis.  But the Court probed the Chong brothers on their understanding of partnership tax law and finds that this item on the statement is, more likely than not, Lok's estimate of prior losses that should have been claimed but weren't.

It is simply impossible to state with any certainty what Yung's adjusted basis was.  It is therefore impossible for us to say how much of any potential loss Yung could have claimed in 1998.  Because we are unable to determine how much loss Yung could potentially have claimed, we sustain the Commissioner's disallowance of the partnership loss on this alternate ground as well.

II.  Schedule C Deductions

In addition to full-time employment and his interest in the partnership with his brother, Yung also pursued a multilevel marketing business with NuSkin.  He reported this business on his

1998 Schedule C, and it showed nearly $10,000 in income that was almost entirely offset by expenses.  We agree with Yung that it "is just common sense" that he would incur expenses in earning an income from his side business.  And the Commissioner doesn't dispute many of Yung's expenses--he disallowed only those deductions that are subject to the limitations of section 274(d).[3]

To claim a deduction for any item described in section 274(d), a taxpayer must substantiate his deduction with "adequate records," such as a logbook or diary, or "sufficient evidence corroborating the taxpayer's own statement," such as the statement of the person(s) entertained.  Sec. 274(d); sec. 1.274-5T(c)(2)(i) and (3)(i), Temporary Income Tax Regs., 50 Fed. Red. 46017, 46020 (Nov. 6, 1985).  These substantiation records must explain:  (A) the amount of the expense; (B) the time and place the expense was incurred; (C) the business purpose of the expense; and, where applicable, (D) the business relationship to the taxpayer of the person(s) entertained.  Sec. 274(d).  Yung didn't meet these standards for any of the disallowed deductions--not even breaking down any of his categories of expense into

---

[3] These include the deductions for repair and maintenance on Yung's cars:  Section 1.274-5T(b)(6)(i)(A), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985), specifically lists "the cost of maintenance and repairs" as one of the "expenditure[s] with respect to an item of listed property" covered by section 274(d)(4).

individual items.  He is therefore not entitled to the disputed Schedule C deductions.

III. Penalty Under Section 6662(a)

The final issue is whether the Chongs are liable for a 20-percent accuracy-related penalty under section 6662(a) for neglecting or disregarding the tax rules and regulations, or for substantially understating their income tax.  The Chongs have the burden of proving that the Commissioner's imposition of this penalty was in error.  See Rule 142(a).  They can do this by showing that, under all the facts and circumstances, they acted with reasonable cause and in good faith.  Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

With regard to the partnership loss, we find that the Chongs did have reasonable cause to claim the loss and acted in good faith.  Partnership tax law is a deceptively complex area.  A reasonable and prudent person with their background and experience wouldn't necessarily know to ask about such things as adjusted basis and distributive shares.  In fact, if such a person received a balance sheet and profit-and-loss statement like Yung did, it is much more likely that he would rely on the totals provided in those papers.  This is especially true in this case, where Lok was a trained accountant (albeit not one trained in U.S. accounting rules) who was in control of all the partnership's records.

On the other hand, we find that the Chongs did not act reasonably and prudently in taking the disallowed Schedule C deductions.  Section 274(d)'s substantiation rules are not complex, nor are they so little known as to be a trap for the average taxpayer.  The Chongs could have done any number of things to discover what was needed to claim the business deductions.  They could have contacted a professional tax preparer or, if they didn't want to spend money on professional assistance, they could have contacted the IRS directly for advice.  The IRS annually publishes an up-to-date version of Publication 463--Travel, Entertainment, Gift, and Car Expenses.  This publication outlines in detail the various business expense deductions which are available and the records required to substantiate them.  The fact that Yung didn't try to keep any sort of ledger or even keep all of his receipts re-enforces our conclusion that the Chongs did not act reasonably.  We find that the Chongs were negligent, and disregarded the rules and regulations, in claiming their disallowed Schedule C deductions.

CONCLUSION

The Chongs are not entitled to their claimed deductions for either the partnership loss or the Schedule C business expenses, and the Commissioner was correct in imposing an accuracy-related penalty under section 6662(a) for their disallowed Schedule C

deductions.  However, the Chongs are not liable for a penalty under that section for claiming a partnership loss.

<u>Decision will be entered under Rule 155</u>.