# United States Tax Court

T.C. Memo. 2025-12

THOMAS W. LANGLOIS,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 6527-18.                          Filed February 3, 2025.

————

Thomas W. Langlois, pro se.

*Frederic J. Fernandez*, *Kerrington A. Hall*, *Megan E. Heinz*, and *Alexander R. Roche*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Judge*: In this deficiency case petitioner, Thomas W. Langlois, challenges the Internal Revenue Service's (IRS) determination of a deficiency of $27,820 and an accuracy-related penalty under section 6662(a)[1] of $5,564 for his 2015 tax year. The IRS concluded, inter alia, that Mr. Langlois was not entitled to deduct reported unreimbursed employee business expenses or partnership losses from Forbearance Power Line Construction, LLC (Forbearance), and Hair Station Express, LLC (Hair Station). After trial and consideration of the support introduced by Mr. Langlois, we agree with the IRS's determinations.

————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[*2]                              FINDINGS OF FACT

The following facts are drawn from the pleadings, the stipulation of facts (together with its attached exhibits), and the evidence at trial. Mr. Langlois lived in Connecticut when he timely petitioned this Court.

I.    *Mr. Langlois's Business Background*

Mr. Langlois has spent his professional career as a union power line worker, a hard and important job. In addition to routine maintenance, power line workers are expected to respond quickly to restore power in challenging environments. At times, they travel far from home with little notice to assist communities ravaged by storms or other natural disasters in getting the lights back on.

Mr. Langlois has an entrepreneurial bent to complement his regular job. In 2008 he started Forbearance, a Connecticut limited liability company, with Denise Dudek, another veteran of the power line industry. In 2012 Mr. Langlois formed Hair Station, an Illinois limited liability company, with Sandra Bedell, a hair stylist. He also owned a single-family rental property in Oak Lawn, Illinois, during 2015.

A.    *Forbearance*

Mr. Langlois and Ms. Dudek started Forbearance as a storm response company, hoping to forge lasting relationships with utilities. Ms. Dudek held a 51% interest in the partnership, with Mr. Langlois accounting for the other 49%. Both partners contributed funds at the start, which were used to buy trucks at auction and the tools necessary to outfit the trucks for power line work. As Ms. Dudek explained at trial, the "recordkeeping in the very beginning wasn't great," and the record contains no evidence as to the amount of Mr. Langlois's initial contribution.

Forbearance did not launch at a propitious time, with 2008 seeing cold economic winds. Forbearance found little power line work during its first three years and accordingly focused on tree work and landscaping work performed by the owners themselves. During this time, it had no employees and was run out of Ms. Dudek's house.

Forbearance's owners covered most expenses by using their personal funds, as banks were reluctant to lend. According to Ms. Dudek, Forbearance's general practice was to retain the receipts for such expenditures, categorizing receipts by partner and type of expense,

[*3] such as fuel, meals, and entertainment. She further explained that the expenditures shown on these receipts were not tracked as partner capital contributions.

Storm response work began to pick up slightly for Forbearance after its first few years. Specifically, Forbearance began to rent its fully outfitted trucks to be used as part of storm response efforts led by a power company or general contractor. Although the power company or general contractor would not hire workers for storm response through Forbearance, Mr. Langlois would often assist in finding appropriate workers for the job and act as supervisor. These workers, including Mr. Langlois, worked directly for the power company or general contractor.

Mr. Langlois, and occasionally Ms. Dudek, paid some expenses in connection with Forbearance's storm response work. For example, the partners might pay for refueling the trucks and tolls. Refueling and tolls for multiple trucks was not straightforward and could require some combination of business credit cards, personal credit cards, and cash. At times, the partners also would pay for snacks, meals, and hotel rooms for the crews that they had brought. The receipts were then turned over to Forbearance and submitted as appropriate for reimbursement by the power company or general contractor that had hired Forbearance.

Such power line jobs were "few and far between," however, and landscaping and construction work around Connecticut remained the bulk of Forbearance's business. Typical expenses in that line of business included fuel, truck maintenance, and job materials, which the partners would purchase using a variety of methods. At times, workers would pay the expenses themselves, and Mr. Langlois or Ms. Dudek would reimburse them later in cash. Forbearance ultimately hired a few employees, including Ms. Dudek's daughter as office manager, at some point between 2010 and 2013.

Forbearance's 2008 through 2014 tax returns reflect its attempts to find its footing. For these years, Mr. Langlois received distributive shares of income or loss in the following amounts:

[*4]

| Tax Year | Distributive Share of Income (Loss) |
|----------|-------------------------------------|
| 2008 | ($17,357) |
| 2009 | (69,510) |
| 2010 | (31,487) |
| 2011 | 6,571 |
| 2012 | (3,801) |
| 2013 | (32,152) |
| 2014 | 3,048 |

### B. *Hair Station*

Mr. Langlois and Ms. Bedell started Hair Station, a hair salon, near a commuter rail stop in Mokena, Illinois. As was the case with Forbearance, Mr. Langlois held a 49% interest in the partnership, with his partner holding the remaining 51% interest. The record before us contains no indication of any initial capital contribution by either partner.

As part of the founding of Hair Station, Mr. Langlois agreed to stake Hair Station a total of $200,000, including up to $60,000 the first year. Ms. Bedell, in turn, agreed to an allocation of 90% of any profits (or losses) from Hair Station to Mr. Langlois.

Mr. Langlois neither cut hair nor lived in Mokena during the years Hair Station was in operation. Ms. Bedell recruited a few other hair stylists from previous jobs to join her at the new shop. These stylists were not employees. As Ms. Bedell explained at trial, "the girls had their own hours they chose to work, and it was 1099 [work]. If they wanted to work late, they could. If they wanted to come in before hours, they could, or after hours."

Mr. Langlois monitored performance by phone calls to his partner when he was out of town and by frequent trips to the shop when he was in Chicagoland. On these visits, Mr. Langlois would strategize with Ms. Bedell about the business, work on advertisements and promotions, talk with the stylists, and perform routine maintenance. As Ms. Bedell put it, "most of the time we were trying to figure out what we can do to make the business better and to . . . draw in more clients into the area."

Hair Station used weekly worksheets to keep track of income and expenses, including products and utilities. It also retained receipts

[*5] marked as "Tom Loan (HSE)," which reflected deposits and fund transfers to either Ms. Bedell's personal account at the PrivateBank or directly to the business's bank account at Old Plank Trail Community Bank, N.A. Hair Station similarly kept checks ostensibly written by Mr. Langlois to either Hair Station or companies including AT&T, Commonwealth Edison, and Dish, which had the same "Tom Loan (HSE)" identifier.

Hair Station "struggled from the beginning" in the face of stiff competition from established salons in the area. From 2012 through 2014 Mr. Langlois received distributive shares of loss from Hair Station of $32,636, $40,309, and $38,569, respectively.

II.     *Mr. Langlois's 2015 Activities*

        A.      *Asplundh Construction Corp.*

During 2015 Mr. Langlois lived in Madison, Connecticut, where he was a member of Local 42 of the International Brotherhood of Electrical Workers (IBEW). He was employed in the power line division of Asplundh Construction Corp. (Asplundh), earning a total of $195,264 in wages over the course of the year.

Mr. Langlois's job for Asplundh encompassed repairing, upgrading, and installing power lines in Connecticut as part of routine maintenance work and the response to storm-related outages. Mr. Langlois was required to supply his own hand tools while working for Asplundh, as well as appropriate clothing and boots. Occasionally the nature of the work called for quick replacement of clothing. As Mr. Langlois explained, if his work boots "got completely soaking wet, . . . [he had] to go out and buy another pair so [he was] not freezing during the course of the storm."

Mr. Langlois's 2015 paystubs from Asplundh reflect payments for meals and miscellaneous expenses exceeding $2,500. Mr. Langlois explained at trial that Asplundh's contract with Local 42 was "basically similar" to a contract with a different union local that established rules governing (1) meal reimbursement rates for extended or emergency work hours, (2) subsistence pay where a worker is assigned to work more than 60 miles from headquarters, (3) lodging reimbursements where a worker is assigned to work more than 100 miles from headquarters, and (4) reimbursement for use of personal automobiles at the company's request.

**[*6]** B. *Travel*

Mr. Langlois purchased a total of 17 airplane tickets going either from Providence, Rhode Island, to Chicago, or vice versa, during 2015. The confirmation emails for each of these trips were sent to Ms. Dudek. In addition to these trips, Mr. Langlois bought roundtrip tickets for a flight between Providence and Phoenix and for a flight from Fort Myers, Florida, to Chicago during 2015.

III. *2015 Tax Reporting and IRS Examination*

A. *Mr. Langlois's Tax Return*

On his 2015 Form 1040, U.S. Individual Income Tax Return, Mr. Langlois reported $195,264 in wages and a loss of $87,793 from rental real estate and partnerships. He reported a loss of $2,829 from his Oak Lawn rental property, derived by subtracting expenses for insurance, mortgage interest, taxes, utilities, and depreciation from $11,000 in rental income. As to his partnerships, Mr. Langlois reported nonpassive losses of $58,381 for Forbearance and $26,583 for Hair Station. The partnerships' own tax returns show that these amounts represented 49% of Forbearance's 2015 ordinary business loss of $119,144 and 90% of Hair Station's ordinary business loss of $29,537.

Mr. Langlois also claimed $41,341 in itemized deductions. Of this total amount, he claimed $21,576 in unreimbursed employee business expenses, which consisted of $175 for parking, tolls, and transportation, $13,031 for travel, and $8,370 for other business expenses.

B. *IRS Examination*

The IRS subsequently selected Mr. Langlois's 2015 tax return for examination. The revenue agent assigned to Mr. Langlois's case recommended the assertion of an accuracy-related underpayment penalty under section 6662(a), with a substantial understatement of income tax under section 6662(b)(2) as her primary position, and negligence under section 6662(b)(1) as her alternative position. On October 20, 2017, the revenue agent's immediate supervisor, a group manager, approved the penalty determination in writing.

The IRS then issued a notice of deficiency to Mr. Langlois on January 3, 2018. As relevant here, the notice of deficiency disallowed Mr. Langlois's claimed deductions for partnership losses in their entirety on the ground that he had "not provided documentation to

[*7] support that [he has] basis in [the] partnership activit[ies]." The notice further limited Mr. Langlois's deduction for unreimbursed employee business expenses to $6,330 in union dues.

OPINION

I.    *Legal Standards*

A.    *Burden of Proof*

The IRS's determinations in a notice of deficiency are presumed correct, and a taxpayer generally bears the burden to prove his entitlement to any deductions he claims. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). A taxpayer must satisfy the specific requirements for any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Although section 7491(a)(1) provides that the burden of proof shifts to the Commissioner in certain defined circumstances, Mr. Langlois does not contend, and the evidence does not establish, that the burden does so here. The burden thus remains with Mr. Langlois.

B.    *Recordkeeping*

A taxpayer is required to keep sufficient records to substantiate his gross income, deductions, credits, and other tax attributes. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a); *see also* Treas. Reg. § 1.6001-1(e) ("The books or records . . . shall be retained so long as the contents thereof may become material in the administration of any internal revenue law."). Adequate substantiation must establish the nature, amount, and purpose of a claimed deduction. *See, e.g.*, *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

For some types of expenses, lack of substantiation can be overcome. *See, e.g.*, *Phillips v. Commissioner*, T.C. Memo. 2013-215, at *22–23. If a taxpayer establishes that a deductible expense has been paid but cannot establish the precise amount of the deductible expense, the Court may estimate the amount. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). In making the estimate the Court bears heavily against the taxpayer who failed to more precisely substantiate the expense. *See id.* at 544; *see also Rogers v. Commissioner*, T.C. Memo. 2014-141, at *17. The Court will not estimate a deductible expense unless the taxpayer presents a sufficient evidentiary basis on which an

**[*8]** estimate can be made. *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 2009 WL 211430, at *4 (stating, with respect to the *Cohan* rule, that "we can't just guess").

"If a taxpayer can establish that he once had adequate records but lost the records because of circumstances beyond his control, such as a fire, flood, or other casualty, then the Court will permit the taxpayer to reasonably reconstruct his expenses." *Phillips v. Commissioner*, T.C. Memo. 2013-250, at *8; *see also Boyd v. Commissioner*, 122 T.C. 305, 320 (2004); Temp. Treas. Reg. § 1.274-5T(c)(5). The taxpayer bears the burden of proving both that the casualty occurred and that his records were destroyed by that casualty. *Adler v. Commissioner*, T.C. Memo. 2010-47, 2010 WL 934267, at *9, *aff'd*, 443 F. App'x 736 (3d Cir. 2011); *see also* Rule 142(a)(1). Crucial to the reconstruction is that the secondary evidence be credible. *See, e.g.*, *Boyd*, 122 T.C. at 320–21. If no other documentation is available, the Court may, but is not required to, accept credible testimony of a taxpayer to substantiate an expense. *Id.* at 320; *see also Cherizol v. Commissioner*, T.C. Memo. 2014-119, at *11.

II.    *Analysis*

A.    *Unreimbursed Employee Business Expenses*

Section 162 generally allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred by the taxpayer in carrying on a trade or business. An individual may be in the trade or business of being an employee, *see Primuth v. Commissioner*, 54 T.C. 374, 377 (1970), and may deduct ordinary and necessary business expenses incurred as part of the trade or business, *see Barnes v. Commissioner*, T.C. Memo. 2016-79, at *7. An expense counts as "ordinary" if it is normal or customary within a particular trade, business, or industry and "necessary" if it is appropriate and helpful for the development of the business. *See, e.g.*, *Commissioner v. Heininger*, 320 U.S. 467, 471 (1943); *Welch v. Helvering*, 290 U.S. at 113–14. Personal, living, and family expenses, however, are not deductible. I.R.C. § 262(a).

To deduct employee business expenses, a taxpayer must not have received reimbursement, and must not have had the right to reimbursement, from his employer. *See Orvis v. Commissioner*, 788 F.2d 1406, 1408 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-533. The taxpayer bears the burden of proving that he is not entitled to

[*9] reimbursement from his employer for such expenses. *See Fountain v. Commissioner*, 59 T.C. 696, 708 (1973). The taxpayer can prove that he was not entitled to reimbursement by showing, for example, that he was expected to bear these costs. *See id.*; *see also Dunkelberger v. Commissioner*, T.C. Memo. 1992-723, 1992 WL 379282, at *2 (finding that management team expected the taxpayer to bear expense of business lunches with vendors). If a taxpayer's business expenses are reimbursed by the employer, then the taxpayer is entitled to a deduction only for the amount of expenses that exceeds the reimbursement. Treas. Reg. § 1.162-17(b)(3); Temp. Treas. Reg. § 1.274-5T(f)(2)(iii); *see also Daiz v. Commissioner*, T.C. Memo. 2002-192, 2002 WL 1796832, at *7.

Mr. Langlois reported $21,576 in unreimbursed employee business expenses for 2015, which comprised $175 for parking, tolls, and transportation, $13,031 for travel, and $8,370 for other business expenses. At trial Mr. Langlois did not attempt to substantiate the precise reported amounts but pointed to two general sources of unreimbursed employee business expenses: (1) amounts spent to purchase tools and clothing, as well as travel expenses to Chicago, while working for Asplundh and (2) amounts incurred during a June 2015 trip to Phoenix, where, according to Mr. Langlois, he was looking for higher paid employment. In addition to his own testimony Mr. Langlois relied on receipts from a variety of stores, including Walmart, Home Depot, Marshalls, and several pawn shops, as well as Southwest Airlines.

1.     *Expenses Related to Asplundh*

We first consider the expenses Mr. Langlois purportedly incurred while working at Asplundh. Mr. Langlois testified that he was required to supply his own hand tools as part of his work for Asplundh, and he submitted several receipts ostensibly showing purchases of various types of tools in 2015. Mr. Langlois, however, did not establish what tools he purchased, whether any tools purchased were required for his 2015 employment, or whether he actually used such tools in connection with his work for Asplundh, rather than for personal use or for Forbearance. *See Savignano v. Commissioner*, T.C. Memo. 1979-1, 1979 Tax Ct. Memo LEXIS 525, at *5; *see also Deihl v. Commissioner*, T.C. Memo. 2005-287, 2005 WL 3446081, at *10 ("Under [section 162], the initial question is whether ownership and maintenance of the property is related primarily to business or to personal purposes.").

As to clothing, we have "established three criteria for the cost of clothing to be deductible as an ordinary and necessary business expense:

**[\*10]** (1) the clothing is required or essential in the taxpayer's employment; (2) the clothing is not suitable for general or personal wear; and (3) the clothing is not so worn." *Barnes*, T.C. Memo. 2016-79, at \*7. Although Mr. Langlois convincingly testified that he occasionally purchased clothing on account of his work for Asplundh, he has failed to demonstrate that such clothing was unsuitable for general or personal wear. *See Ayria v. Commissioner*, T.C. Memo. 2022-123, at \*9 ("[I]t is well established that the costs of purchasing and maintaining ordinary street attire are not deductible merely because those clothes are worn to the office."). And our inspection of the receipts, which show purchases of sweatshirts, boots, and socks, does not suggest otherwise. *See Kinney v. Commissioner*, T.C. Memo. 2008-287, 2008 WL 5330815, at \*9.

In his brief Mr. Langlois argues that expenses for trips to Chicago from Connecticut "to check on [his] businesses and rental properties" were deductible travel expenses. A taxpayer, of course, may deduct reasonable and necessary travel expenses such as meals and lodging incurred "while away from home *in the pursuit of a trade or business*." I.R.C. § 162(a)(2) (emphasis added). To do so, he must show that he was away from home when he incurred the expense, that the expense is reasonable and necessary, and that the expense was incurred in pursuit of a trade or business. *See Commissioner v. Flowers*, 326 U.S. 465, 470 (1946).

"This deduction is meant to alleviate the burden on taxpayers whose business or employment requires them to incur duplicative living expenses." *Harwood v. Commissioner*, T.C. Memo. 2022-8, at \*9. For these purposes, a taxpayer's home generally refers to the vicinity of a taxpayer's principal place of business rather than his personal residence. *See, e.g.*, *Mitchell v. Commissioner*, 74 T.C. 578, 581 (1980); *Kroll v. Commissioner*, 49 T.C. 557, 562 (1968) ("When, then, a taxpayer moves to a new permanent post of employment, it is generally reasonable to expect him to move his residence as well, and if he does not do so, and thereby incurs living expenses at his new post of employment while maintaining his old residence, the duplication again does not arise from business needs, but from personal considerations.").

Mr. Langlois's tax home in 2015 was Connecticut, where he worked for Asplundh, had a residence, served as a partner in Forbearance, and was a member of Local 42. The record before us discloses no travel expenses that Mr. Langlois incurred on behalf of Asplundh, and Mr. Langlois's own testimony establishes that he worked for Asplundh only in Connecticut. Any expenses that Mr. Langlois

**[\*11]** incurred in traveling to and from Chicago thus were not in pursuit of his employment with Asplundh. Consequently, they are not deductible as unreimbursed employee business expenses.[2]

As a final point, Mr. Langlois failed to show that he was not entitled to reimbursement for any expenses incurred, or that he did not receive such reimbursement, under Asplundh's reimbursement policies. Mr. Langlois's paystubs reflect that the company paid him for meals and miscellaneous expenses on multiple occasions in 2015. The record contains a reimbursement policy that Mr. Langlois described as "basically similar" to the reimbursement policy that governed his employment, as well as a portion of an Asplundh reimbursement policy provided by Mr. Langlois to the IRS. Although we find credible Mr. Langlois's position that certain reimbursements described in those documents were limited to management personnel, he did not demonstrate that the expenses he deducted were nonreimbursable. *See Humphrey v. Commissioner*, T.C. Memo. 2017-78, at \*8 (finding that the taxpayer did not substantiate his expenses because there were no "records of any reimbursement claims" and he "neither testified nor offered other evidence showing otherwise"); *see also Orvis v. Commissioner*, 788 F.2d at 1408.

2. *Job Search Expenses*

In addition to the expenses purportedly related to Asplundh, Mr. Langlois introduced evidence at trial related to expenses incurred on a trip to Phoenix. According to Mr. Langlois, he flew to Phoenix to scout the Arizona and California job markets for higher paying positions. His evidence in support of this contention consisted of a Southwest Airlines receipt printed in 2017 for a roundtrip flight from Providence to Phoenix and handwritten notes. The handwritten notes state that he drove to three IBEW local unions from "Dad's house" in Sun City, Arizona, for the purpose of putting his name in their respective books (thus giving him an advantage for future employment in their jurisdictions). The notes include distances between those destinations, which Mr. Langlois converted into mileage expenses.

---

[2] In his brief Mr. Langlois states that "[w]hile working in one state and owning a business and rental property in another a person is entitled to travel expenses to check on those businesses and rental properties." He fails to develop this conclusory assertion, much less establish that the airfare was a partnership expense of Forbearance or Hair Station.

[*12] Section 162(a) allows taxpayers to deduct expenses paid in searching for new employment in the same trade or business. *See Primuth*, 54 T.C. at 378; *see also Sutherland v. Commissioner*, T.C. Memo. 2018-186, at *9. Mr. Langlois reported travel expenses and vehicle expenses related to his purported job search, and thus he must satisfy the strict substantiation requirements of section 274(d). *See* I.R.C. § 274(d)(1), (4); *see also Sutherland*, T.C. Memo. 2018-186, at *10. To do so, he must substantiate "by adequate records, or by sufficient evidence corroborating his own statement, the amount, time, place, and business purpose for each expenditure." *See Geiman v. Commissioner*, T.C. Memo. 2021-80, at *9.

Mr. Langlois again fails to substantiate his expenditures. As to vehicle expenses, Mr. Langlois argues that he was entitled to $1,324 under the standard mileage rate, based on the miles he drove to the various local unions while looking for work. The standard mileage rate, however, "applies only to personally owned or leased automobiles." *See, e.g., Christine v. Commissioner*, T.C. Memo. 2010-144, 2010 WL 2640125, at *5, *aff'd*, 475 F. App'x 259 (9th Cir. 2012). Mr. Langlois has not demonstrated that he was driving his personal vehicle in Arizona and California.

As to the air travel expense, Mr. Langlois has established that he bought a roundtrip ticket to Phoenix but did not corroborate the business purpose, i.e., his job search. Mr. Langlois introduced no evidence from the three local unions that would show that he visited them and signed their books. The only documentation that he offered in support of his purported search was his own noncontemporaneous notes, which were written two years after the trip and purported to reflect driving distances from "Dad's house" to the various locals. Mr. Langlois's documentation is inadequate to satisfy the strict substantiation requirements to deduct the expenses of his purported job search.

B.    *Partnership Losses*

The Commissioner also disallowed Mr. Langlois's $84,964 in partnership losses reported on Schedule E, Supplemental Income or Loss, on the ground that Mr. Langlois failed to substantiate his basis in either Forbearance or Hair Station.

Generally, a partner can deduct his share of a partnership's loss for a taxable year only to the extent of the adjusted basis of his

**[\*13]** partnership interest at the end of the year. I.R.C. § 704(d). A partner's basis is increased in part by the partner's distributive share of income and the partner's contributions to the partnership. I.R.C. §§ 705(a)(1), 722; *see also Simpson v. Commissioner*, T.C. Memo. 2023-4, at \*26. Any increase in a partner's share of the partnership's liabilities or a partner's assumption of the partnership's liabilities also increases the partner's basis. I.R.C. § 752; *see also Duffy v. Commissioner*, T.C. Memo. 2020-108, at \*47 ("[A] partner's payment of partnership expenses can be treated as a contribution to the partnership, with the paying partner then entitled to deduct his allocable share of the expense."). A partner's basis is decreased by the partner's distributive share of partnership losses, nondeductible expenses, and distributions. I.R.C. §§ 705(a)(2), 733; *see also Kohout v. Commissioner*, T.C. Memo. 2022-37, at \*11, *aff'd*, No. 23-11135, 2024 WL 3069309 (11th Cir. June 20, 2024).

If the partner cannot establish his adjusted basis in the partnership, then he cannot deduct any partnership losses. *See* I.R.C. § 704(d); *Sennett v. Commissioner*, 80 T.C. 825, 829 (1983), *aff'd per curiam*, 752 F.2d 428 (9th Cir. 1985). "Proof of basis is a specific fact which the taxpayer has the burden of proving." *O'Neill v. Commissioner*, 271 F.2d 44, 50 (9th Cir. 1959), *aff'g* T.C. Memo. 1957-193; *see also Powers v. Commissioner*, T.C. Memo. 2013-134, at \*28–30.

Mr. Langlois has failed to provide credible evidence of his adjusted basis in either Forbearance or Hair Station for 2015. To determine Mr. Langlois's adjusted basis, we need to understand his initial contributions, any subsequent contributions (or the assumption of partnership liabilities), and his annual distributive share of partnership income or losses since the partnership began. *See, e.g.*, *Chong v. Commissioner*, T.C. Memo. 2007-12, 2007 WL 109055, at \*4. Mr. Langlois stumbles from the start, as nothing in the record indicates the amount of his initial capital contribution for either partnership.[3]

Lacking proof of his initial contributions, Mr. Langlois focuses on what he purports to have subsequently contributed to each partnership. Mr. Langlois argues that he contributed at least $259,049 to Forbearance between 2008 and 2015, and $178,099 to Hair Station. Mr. Langlois asserts that he is entitled to claim the respective partnership losses for 2015 because these contribution amounts exceed the total

---

[3] Along these same lines, we note that Mr. Langlois also failed to introduce a written partnership agreement for either Forbearance or Hair Station.

[*14] distributive shares of loss for each partnership reported on his tax returns, which totaled $144,688 for Forbearance (2008–14) and $111,514 for Hair Station (2012–14).

The proof for each partnership is wanting in its own way. For Forbearance, Mr. Langlois introduced a digital dump truck of receipts for all manner of expenses, reflecting payments in cash and from many credit cards across multiple states. Forbearance did not treat these receipts as proof of indirect capital contributions by Mr. Langlois, and we will "not sort through . . . voluminous evidence to decide whether [he] substantiated each and every expense he claimed." *See Venuto v. Commissioner*, T.C. Memo. 2017-123, at *9; *see also Akey v. Commissioner*, T.C. Memo. 2015-227, at *21; *Patterson v. Commissioner*, T.C. Memo. 1979-362, 1979 Tax Ct. Memo LEXIS 162, at *7 (determining that the taxpayer failed to carry his burden of proving trade or business items in that he "has chosen to rely on what may be termed the 'shoebox method' of attaching photocopies of numerous cash register tapes and of similar bits of paper to his returns, without making any effort on the returns or on brief, and only a slight effort in oral testimony, to link any item to a deductible trade or business expense transaction").

Even if we were to consider the receipts, it would not avail Mr. Langlois. Although we accept Mr. Langlois's and Ms. Dudek's testimony that they paid some expenses related to Forbearance's storm response work, Mr. Langlois fails to connect the receipts before us with Forbearance business expenditures. Most of the receipts do not establish that he himself made the expenditure but show either a cash transaction or payment by a credit card number that does not belong to Mr. Langlois. Moreover, the receipts by and large do not establish any clear business purpose, as they encompass expenditures, such as fuel and meals, that could just as easily be personal.

Mr. Langlois responds that the receipts reflect cash payments that he made for Forbearance expenses or receipts paid by other workers on behalf of Forbearance that he then reimbursed. Mr. Langlois, however, fails to introduce any bank account statements that might support the idea that he paid more than $250,000 on Forbearance's behalf from 2008 to 2014 or work schedules that might bolster his contention that he was reimbursing others for expenses incurred during Forbearance work. Although Mr. Langlois and Ms. Dudek assert that Forbearance would not have retained a receipt in Mr. Langlois's file unless it were a partnership expense he paid, this contention is

**[\*15]** insufficient to substantiate the expenses, particularly in light of Forbearance's shaky recordkeeping.[4] *See Hradesky*, 65 T.C. at 90; *see also Shah v. Commissioner*, T.C. Memo. 2015-31, at \*43 (rejecting as sufficient substantiation the claim that a taxpayer "never entered an expense into Quicken without supporting bank information"); *Hopkins v. Commissioner*, T.C. Memo. 2005-49, 2005 WL 615687, at \*5 ("A taxpayer's general statement that his or her expenses were incurred in pursuit of a trade or business is not sufficient to establish that the expenses had a reasonably direct relationship to any such trade or business.").

In the absence of further support, we cannot conclude the receipts reflected payment of partnership expenses by Mr. Langlois that constitute indirect capital contributions. Mr. Langlois thus has failed to show his adjusted basis in Forbearance and cannot deduct any partnership losses.

Mr. Langlois fares little better with respect to Hair Station, failing to establish that he had a sufficient adjusted basis in 2015 to deduct the partnership losses.[5] In this Court, Mr. Langlois has introduced tally sheets related to his purported 2012–14 capital contributions, which divide these amounts into categories including "1099s," "deposits," "transfers," and "check receipts." Mr. Langlois also has submitted some documentation to support the amounts recorded for each category.

The documentation with respect to the "1099s" category refutes any notion that it captures capital contributions. The record includes Forms 1099-MISC, Miscellaneous Income, for the years at issue, which show payments from Hair Station itself to independent contractor hair stylists in the amounts reflected on Mr. Langlois's tally sheets. Hair

---

[4] As illustrated at trial, Forbearance's bank accounts are replete with indications that it treated personal expenses of the partners as partnership expenses, including cruises, Disney World vacations, and a Hawaii timeshare. Although we do not rule out the possibility that these expenditures might constitute partnership expenses, a trust-but-verify approach to Forbearance's categorizations seems prudent. Mr. Langlois did not verify the purported indirect capital contributions.

[5] Although Ms. Bedell treated the financial arrangement with Mr. Langlois as a loan, we will assume for the sake of argument that Mr. Langlois made contributions, consistent with both parties' briefs.

**[\*16]** Station, not Mr. Langlois, thus made the payments, and he cannot claim them as his own capital contributions.[6]

This conclusion has important repercussions for the deductibility of Mr. Langlois's 2015 partnership losses. A partner's "adjusted basis can't go below zero; if his distributive share of partnership losses is greater than his available adjusted basis, the excess loss can't be claimed in that year but must instead be carried forward until he once again has adjusted basis available to offset the loss." *Chong v. Commissioner*, 2007 WL 109055, at \*4. The removal of the "1099s" amounts from Mr. Langlois's total capital contributions leaves him with insufficient basis to claim the 2015 Hair Station losses.[7]

C.      *Accuracy-Related Penalty*

In the notice of deficiency the Commissioner also determined a 20% accuracy-related penalty against Mr. Langlois upon the portion of any underpayment of tax required to be shown on the return that is attributable (among other things) to any "substantial understatement of income tax." *See* I.R.C. § 6662(a), (b)(2). Section 6662(d)(2) generally defines the term "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed. An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. *See* I.R.C. § 6662(d)(1)(A).

---

[6] The record does not suggest that Mr. Langlois provided the money that Hair Station used to pay the independent contractors, aside from the amounts otherwise reflected as deposits, transfers, and check receipts on the tally sheets.

[7] *Ecce* math. Mr. Langlois contended that he made capital contributions of $59,309 in 2012; removing the Form 1099 category reduces this amount to $49,917. After we take into account his 2012 distributive share of loss from Hair Station ($32,636), he is left with an adjusted basis of $17,281. For 2013 the removal of the Form 1099 category reduced his claimed capital contributions from $55,925 to $20,342. Adding his 2012 basis to his 2013 contributions yields $37,623, which is less than the distributive share of loss he claimed for 2013 ($40,309) and left him with an adjusted basis of zero (and a surplus loss of $2,686). Things continued along this path in 2014, which saw a reduction in his contributions to $20,793, well below the sum of the carryforward loss from 2013 ($2,686) and the distributive share of the 2014 loss he claimed ($38,569), which left him with an adjusted basis again of zero and a loss of $20,462 to be carried forward. Even assuming that Mr. Langlois made capital contributions of $15,189 in 2015 as he asserts, he has an insufficient basis—in light of the loss carryforward of $20,462—to deduct the distributive share of loss claimed on his 2015 tax return ($29,537).

**[\*17]** Section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty." Once he meets his burden of production, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Higbee*, 116 T.C. at 447.

The Commissioner has met his burden. Under section 6751(b), "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." The Commissioner has supplied a civil penalty approval form, establishing that the revenue agent's immediate supervisor approved the relevant penalty before issuance of the 30-day letter and notice of deficiency to Mr. Langlois, and Mr. Langlois does not challenge this point.

The Commissioner moreover has shown that Mr. Langlois substantially understated his income tax. Mr. Langlois reported tax on his return of $12,706, but his correct tax required to be shown on the return was $40,526, leaving an understatement of $27,820. This understatement is greater than both 10% of $40,526 ($4,053) and $5,000. *See* I.R.C. § 6662(d)(1)(A).

Finally, Mr. Langlois has not put forth any evidence to the contrary nor contested this determination in his petition or posttrial briefing. He is therefore liable for the 20% accuracy-related penalty under section 6662(a).

III. *Conclusion*

In sum, we sustain the determinations by the IRS in the notice of deficiency[8] and conclude that Mr. Langlois is liable for the section 6662(a) accuracy-related penalty.

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[8] For purposes of completeness, we note that Mr. Langlois did not challenge the Commissioner's disallowance of the loss deduction he claimed with respect to his Oak Lawn rental property and thus conceded the point. *See* Rule 34(b)(1)(G) ("Any issue not raised in the [petition's] assignments of error will be deemed conceded.").